UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

CHARLES MALMBERG,

        Plaintiff

        vs.

Civil Case No. 06-CV-1042 (FJS/GHL)

UNITED STATES OF AMERICA,

        Defendant.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**PROPOSED FINDINGS OF FACT AND CONCLUSIONS
OF LAW SUBMITTED BY THE UNITED STATES**

NOW COMES defendant, United States of America, and for its proposed findings of fact and conclusions of law, submits the following:

I. **Proposed Findings of Fact**

    **A.** **Liability**

    1. On November 4, 2004 plaintiff was an appropriate candidate for an Anterior Cervical Disectemy with Fusion (ACDF).

    2. On November 4, 2004, plaintiff was put on hold in the operating room at approximately 10:45 a.m.

    3. Subsequently, plaintiff was brought into the operating room and placed on the operating table in the supine position. At approximately 11:00 am he was placed under general anesthesia and intubated.

4.	His chin was placed in a strap, and put under gentle traction. He was positioned, shoulders retracted, and prepped and draped in a sterile neurosurgical fashion.

5.	At approximately 11:38 am a transverse incision was made in the right hemicervical region below the level of the cricoid cartilage.

6.	Hand-held retractors were inserted to further define the operative plane. Kitner pushers to dissect the prevertebral soft tissue were used to expose the cervical column.

7.	Next, with gentle retraction, the C5-C6 space was identified and a spinal needle was used to verify location. After fluroscopic radiograph, it was found to be the C6-C7 space. The needle was moved up a space and position as being C5-C6 was verified with the fluroscope. The prevertebral plane was further defined and the longus colli was dissected laterally, with gentle retraction and bipolar cautery.

8.	With a combination of curette and pituitary rongeur, the disk space from the inner half of the C5-C6 innerspace was removed.

9.	Next a biting curette and Kerrison were used to remove more material.

10.	A 5-mm rough diamond bur on an electric drill was used to further clean out the space. Posteriorly, osteophytic ridges were encountered on both the inferior border of C5 and the superior border of C6. These were drilled down with the bur as well.

11.	Next, the upbiting curette was used to work through the posterior longitudinal ligament and sequentially remove any material from behind the osteophytic ridges.

12.	Once a plane was developed, the Kerrison rongeur was inserted and the osteophytic ridges on both the inferior and superior end plates were taken down in either direction and the vertebral procedure continued

13. Once the surgeons were satisfied with the decompression, they concentrated laterally on the foramen. Again, the Kerrison rongeur was used to remove any material from the foramen and performed the foraminotomy.

14. Next, the cartilaginous end plates were removed, with the upbiting curette. A rongeur was used to trim down the anterior aspect of the vertebral bodies, so snug fitting could be ensured.

15. After appropriate preparation, a 5-mm medium-size graft was inserted into the C5-C6 interspace and, with a tampon mallet, was gently worked into place.

16. Following insertion of the graft, four 13-mm soft-drilling screws were used to secure a Zephyr 22.5-mm plate into place.

17. The plate and screws were verified with fluroscopic imaging and determined to be adequately placed.

18. Following fluroscopic imaging, the self-retaining retractors were removed and the wound was inspected for any areas of bleeding.

19. The wound was irrigated and closed.

20. Surgery was complete at 13:50, plaintiff was extubated at approximately 14:04, transported to the stretcher, and moved to the recovery room.

21. The surgical procedure was uneventful, except for some bulging of the dural tube that was noted while performing the decompression.

22. The ACDF was performed by Dr. Krishnamurthy, as the attending surgeon and Dr. Blaskiewicz, as the resident surgeon.

23. During the ACDF surgery, Dr. Krishnamurthy used a microscope, as he does not perform any ACDF with a microscope (magnification).

24.     During the course of the ACDF, distraction in the form of traction was used.

25.     An emergent MRI scan of the cervical spine taken post surgery on November 4, 2004, revealed material characteristic of a cervical fusion plug located in the C5-6 space and there was some higher T2 signal material along the posterior space, which was probably post-surgical material. At C5-6 there was also bulging outward mildly into the spinal canal, causing mild impingement on the thecal sac.

26.     The November 4, 2004 MRI also noted extensive edema and swelling of the spinal cord from C4-5 down to C6-7 which was read as potentially being due to an acute injury to the cord such as ischemia, contusion or residual edema from a compression that had since been relieved by the new surgery.

27.     Under impression, the MRI noted no evidence of a hematoma or other collection within the spinal canal, mild cord impingement at C4-5, C5-6 and C6-7, extensive edema in the cord, which was out of proportion to the degree of cord impingement, which may have been due to a contusion of the cord or represent edema in the cord relating to a pre-existing degree of compression that had since been relieved.

28.     Following the emergent MRI on the afternoon of November 4, 2004, an x-ray of the cervical spine was taken and revealed metallic plate and screws affixing C5-C6 with a bone graft seen within the intervertebral space at C5-6. The posterior alignment of the bone graft appeared to be maintained.

29.     Both the November 4, 2004 MRI and November 4, 2004 x-ray revealed that the bone graft was properly placed and do not show that the bone graft was touching and/or protruding upon plaintiff's spinal canal.

30. An MRI of plaintiff's cervical spine taken on December 16, 2004 shows that the bone graft was in an appropriate location, and not touching and/or protruding upon plaintiff's spinal canal.

31. Subsequent MRI's of plaintiff's cervical spine taken on April 3, 2007 and May 27, 2000 likewise show that the bone graft was in an appropriate location, and not touching or protruding upon plaintiff's spinal canal.

32. The cause of the spinal cord swelling which resulted in plaintiff's injuries, cannot be stated with certainty.

**B.   Damages**

1. Plaintiff was born on November 20, 1959 and apparently enlisted in the Army in 1977.

2. Following his discharge from the Army, his work history was somewhat spotty. From 2001 to 2002, he worked for Cortland Ford and a concession stand at Greek Peak.

3. Apparently, plaintiff was injured while mopping the floor at Cortland Ford in July of 2002 and has not worked since.

4. As of November 27, 2000, plaintiff had been previously treated for depression and anxiety, and was on Paxil.

5. Prior to November 27, 2000, plaintiff's health was not good, he felt that he was neglecting himself, sleeping only 2 to 3 hours per night. In 2002, plaintiff was seen at various times by various medical facilities–Binghamton V.A. Outpatient Clinic (BOC), Cortland Community Based Outpatient Clinic (CBOC), and the SVAMC.

6. On August 12, plaintiff was seen at CBOC for left-sided neck pain, with numbing and tingling radiating down left arm, which started on July 23, 2002, after performing custodial duties at work.

7. Plaintiff was seen in April and June of 2003, by Dr. Hunsinger, reporting that physical therapy did not result in any improvement, and for recheck of possible chronic prostatitis.

8. On April 28, 2003, plaintiff was seen for followup, complaining of a lot of neck, shoulder, and arm pain and weakness, pain as high as 8/10 at times.

9. Plaintiff was seen by Dr. Hunsinger on January 7, 2004, at the CBOC complaining of slowly losing arm strength.

10. On January 20, 2004, he was seen by senior phychologist Robert Sprafkin, complaining of depressive symptoms. In particular, he attributed present depression to stress from not working since July of 2002, when he was injured on the job.

11. On March 5, 2004, plaintiff was seen in the SVAMC neurosurgery clinic, complaining of worsening neck pain, to the point that his range of motion was significantly restricted, he also complained of severe pain primarily in his left arm, but now spreading to the right arm, in addition with numbness/burning eresthesias in the left arm and second and third fingers, consistent with C6 dermatome.

12. On May 18, 2004, plaintiff continued to experience significant neck pain, limited range of motion in his left arm, pain in the left arm, and was beginning to have some numbness and tingling in the right hand. He was noted to have some tremors and fasculatones of his left hand with testing.

13. In May of 2004, he presented with a tooth infection and surgery was cancelled due to the risk of graft infection.

14. On August 12, 2004, plaintiff was noted to have a substantial increase in left arm numbness, exacerbated by certain movements of his neck.

15. Plaintiff was scheduled to have his ACDF surgery in September of 2004, but this was cancelled due to equipment problems (microscope was being repaired).

16. On September 28, 2004, it was noted that plaintiff was anxious to have his neck surgery done soon, as there was a substantial increase in left arm numbness, exacerbate by certain movements of his neck, and an intermittent burning type pain in the left arm, tremor remained reasonably controlled on Valium.

17. In February of 2010, plaintiff was seen by David A. Hunsinger, M.D., a physician at the Binghamton VA Outpatient Clinic that has been providing medical care and treatment to him since 2002.

18. In a letter report, dated February 17, 2010, Dr. Hunsinger noted that plaintiff is currently totally disabled with a C7 incomplete quadriplegia, which occurred following a C5-C6 ACDF. This has resulted in lower extremity spasticity and weakness.

19. Dr. Hunsinger notes that plaintiff has an impaired bladder function and performs self catheterization several times daily, despite this he often has episodes of urinary incontinence. He also requires daily antibiotics to prevent recurrent urinary tract infections.

20. From a functional standpoint, plaintiff is able to feed himself and perform most self hygiene. He does require aid service to assist with household chores and has a home-based primary

care nurse, who assists with wound care and medication management, as well as periodically assessing his health and home.

21. Dr. Hunsinger concludes that plaintiff's condition is permanent and unlikely to improve, he will likely experience continued decline in function and the assistance needed to maintain independent living will increase over time to include more frequent aid service and nursing visits.

22. Following his November 4, 2004 surgery, plaintiff applied for and is receiving veterans' benefits under Title 38 U.S.C. § 1151, Social Security Disability benefits, and long-term disability insurance payments.

23. At present plaintiff is receiving approximately $2,870 in 38 U.S.C. § 1151 benefits.

24. As of July 27, 2007, plaintiff was receiving approximately $431 every two weeks from Workmen's Compensation, and approximately $192 per month from Social Security.[1]

25. Plaintiff has been receiving benefits from the Veterans Administration in connection with the injuries resulting from his November 4, 2004 surgery pursuant to Title 38 U.S.C. § 1151.

26. Through December 31, 2009 he had been paid approximately $165,596 in 38 U.S.C. §1151 benefits; his monthly benefit in December of 2009 was $2,870.

27. At this time, the total amount plaintiff has received in Social Security disability payments in not known.

28. This is essentially a pain and suffering case. Plaintiff makes no claim for economic loss, nor has he made any claim for damages for medical care and/or treatment – including physical therapy, rehabilitation, or assistive devices.

---

[1] These amounts may have changed.

II.     **Conclusions of Law**

This action arises under the FTCA, which waives the United States' sovereign immunity from suits for personal injury damages caused by the "negligent or wrongful act or omission" of its employees "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of th place where the act or omission occurred." 28 U.S.C. §1346(b); Guccione v. United States of America, 847 F.2d 1031, 1033 (2d Cir. 1988); Hurwitz v. United States of America, 884 F.2d 684, 686 (2d Cir. 1989), cert. denied, 493 U.S. 1056 (1990); Avakian v. United States of America, 739 F. Supp. 724, 730 (N.D.N.Y. 1990). Because the alleged negligence in this case occurred in New York, the law of the State of New York is controlling.

1.      To establish a claim of medical malpractice under New York law, a plaintiff must prove that (1) the defendant breached the standard of care; and (2) the breach proximately caused the plaintiff's injuries, Taylor v. Nyack Hosp., 18 A.D. 3d 537, 795 N.Y.S. 2d 317, 318 (2d Dep't 2005), *see also* Nestorowich v. Ricotta, 97 N.Y.2d 393, 398, 740 N.Y.S.2d 668, 672 (2002), *citing* Pike v. Honsinger, 155 N.Y.201, 49 N.E. 760 (1898).

The standard of care for physicians requires the exercise of the "reasonable degree of learning and skill that is ordinarily possessed by physicians and surgeons in the locality where [the doctor] practices." Nestorowich, 97 N.Y.2d at 398, 740 N.Y.S.2d at 671. A physician owes his/her patient the duties 1) to possess the requisite degree of skill and knowledge of a medical professional in the community; (2) to exercise the due care of a reasonably prudent doctor; and (3) to employ his "best judgment" in exercising his skill and applying his knowledge. Perez v. United States, 85 F.Supp.2d 220, 226 (S.D.N.Y. 1999), *aff'd*, 85 Fed. Appx. 48 (2d Cir. 2001); Nestorowich, 97 N.Y.2d at 398, 767 N.E.2d at 128, 740 N.Y.S.2d at 671. In the words of the New York Court of Appeals, a doctor

may be liable for medical malpractice "only if the doctor's treatment decisions do not reflect his best judgment, or fall short of the generally accepted standard of care." Nestorowich, 97 N.Y.2d at 399, N.Y.S.2d at 672.

    2.    A physician is not liable for malpractice "merely because a treatment, which the doctor as a matter of professional judgment elected to pursue, proves ineffective or a diagnosis proves inaccurate. Not every instance of failed treatment or diagnosis may be attributable to a doctor's failure to exercise due care." Nestorowich, 97 N.Y. 2d at 398, *citing* Schrempf v. State of New York, 66 N.Y. 2d 289, 295, 495 N.Y.S. 2d 973 (1985); Shahram v. Horwitz, 5 A.D.3d 1034, 1035, 773 N.Y.S.2d 642, (4th Dep't 2004). "Implicit within the concept of due care is the principle that doctors must employ their 'best judgment in exercising. . .skill and applying [their] knowledge'" Nestorowich, *citing* Topel v. Long Is. Jewish Med. Ctr., 55 N.Y.2d 682, 446 N.Y.S.2d 932 (1981); Johnson v. Yeshiva University, 42 N.Y.2d 818, 396 N.Y.S.2d 647 (1977). The "best judgment" rule or "error in judgment" doctrine requires that a "doctor must use [his] best judgment and whatever superior knowledge or skill [he] possesses, even if the knowledge and skill exceeds that possessed by the [average doctor] in the medical community where the doctor practice." Nestorowich, 97 N.Y.2d at 398 n.4, 767 N.E.2d at 128, 740 N.Y.S.2d at 671. As noted above, however, a doctor is not liable in negligence merely because a treatment, which is within the bounds of accepted practice and which the doctor elected to pursue as a matter of professional judgment, proves ineffective, or a diagnosis proves inaccurate. Topel, 55 N.Y.2d at 689. Rather, under the prevailing "error in judgment doctrine," a doctor may only be liable if his/her treatment decision did not reflect his or her own best judgment following a careful examination, or fell short of the accepted standard of care. Nostorowich, 97 N.Y.2d at 399; Davis v. Patel, 287 A.D.2d 479, 480, 731 N.Y.S.2d 204 (2d Dep't

2001); Ibguy v. State of New York, 261 A.D.2d 510, 690 N.Y.S.2d 604 (2d Dep't 1999). As the Court of Appeals has been at pains to note, the "best judgment" doctrine is intended to protect those medical professionals who, in exercising due care, choose from two or more responsible and medically acceptable approaches. Nostorowich, 97 N.Y.2d at 399-400. *See* also Schrempf v. State of New York, 66 N.Y.2d at 295.

3.  The Court of Appeals has consistently held that physicians, by undertaking to treat a patient, do not guarantee a good result. Nestorowich, 97 N.Y.2d at 399, 767 N.E.2d at 129, 740 N.Y.S.2d at 672; Schrempf v. State, 66 N.Y.2d at 295. Indeed, the "mere fact that a medical procedure was unsuccessful, or had an unfortunate effect, will not support a claim that negligence had occurred." Perez v. United States, 85 F.Supp.2d 220, 227 (S.D.N.Y. 1999) *aff'd*. 85 Fed. Appx. 48 (2d Cir. 2001). Instead, as the Court of Appeals explained in Nestorowich, a physician "does not guarantee a good result, but he promises by implication to use the skill and learning of the average physician, to exercise reasonable care and to exert his best judgment in the effort to bring about a good result." 97 N.Y.2d at 399, 740 N.Y.S.2d at 672.

4.  Proximate or legal cause is defined as "that which in a natural and continuous sequence, unbroken by any new cause, produces [the event complained of] and without which that event would not have occurred." Caraballo v. United States, 830 F.2d 19, 22 (2d Cir. 1987), *citing* Rider v. Syracuse Rapid Transit Ry. Co., 171 N.Y. 139, 147, 63 N.E. 836 (1902); Lamarca v. United States, 31 F.Supp. 2d 110, 126-27 (E.D.N.Y. 1998). The concept of proximate cause or, more appropriately, legal cause, is an elusive one, incapable of being precisely defined to cover all situations. Derdiarian v. Felix Contracting Corp., 51 N.Y.2d 308, 314-15, 434 N.Y.S.2d 166, 169 (1980). This results, in part, because the concept stems from judicial policy considerations that serve

to place "manageable limits" upon the liability that may flow from negligent conduct. *Id*. (citations omitted).

  5. To establish legal causation, then, a plaintiff must prove by a preponderance of the evidence 1) that the physician's negligence was "a substantial factor in producing all of plaintiff's injuries," Dombrowski v. Moore, 299 A.D.2d 949, 952, 752 N.Y.S.2d 183, 186 (4th Dep't 2002); *see* Derdiarian v. Felix Contracting Corp., *supra,* and 2) that the injury was a reasonably foreseeable result of the proven negligence. Lamarca, 31 F.Supp.2d at 126. Unless an ordinary lay person could decide whether proximate cause exists, without any professional assistance, the plaintiff bears "the burden of producing expert medical testimony showing proximate cause in medical malpractice actions." Hegger v. Green, 646 F.2d 22, 28 (2d Cir. 1981); Sitts v. United States, 811 F.2d 736, 739-40 (2d Cir. 1987).

  6. New York CPLR 4545(a) provides in pertinent part:

> In any acts brought to recover damages for personal injury . . . where the plaintiff seeks to recover for the cost of medical care, dental care, custodial care or rehabilitation services, loss of earnings or other economic loss, evidence shall be admissible for consideration by the court to establish that any such past or future cost or expense was, or will, with reasonable certainty, be replaced or indemnified, in whole or in part, from any collateral source, except for life insurance and those payments as to which there is a statutory right of reimbursement.

The statute goes on to direct that the court "shall reduce" the amount of any award in the case by the amounts of such collateral sources of compensation.

  7. In Morgan v. United States, 968 F.2d 200, 206-08 (2d Cir. 1992), the Second Circuit held that the entire amount of a personal injury award under the Federal Tort Claims Act must be reduced by the entire amount of any VA benefits awarded to a plaintiff under Title 38 U.S.C.§ 351

12

(now § 1151) for the same injury. The court specifically rejected the argument that the offset should be limited to the portion of the FTCA award intended to compensate for lost earning capacity. *Id.*, citing Ulrich v. United States, 853 F.2d 1078, 1082-83(2d Cir. 1988).  Thus, in the event of a judgment in Mr. Malmberg's favor in this case, the total amount awarded to him must be reduced by the total amount of § 1151 benefits paid to him by the VA up to the date of the award. Morgan, *supra*; *see* also Parkins v. United States, 842 F.Supp.617, 621 (D.Conn. 1993).

8.    No offset of future §1151 benefits is necessary, however. This is so because Title 38 U.S.C. § 1151(b) requires that, in the event of a judgment or settlement in his favor in this case, Mr. Malmberg's future §1151 benefits will cease until such time as the amount he would have been paid in such benefits equals the dollar amount recovered in this lawsuit. Thus, by operation of this provision of the statute, double recovery is not a danger with respect to post-judgment §1151 benefits.

9.    At this time, the total amount Mr. Malmberg has received in Social Security disability payments is not known.  His Social Security disability benefits are not affected by the outcome of this lawsuit.  Pursuant to New York CPLR § 4545(a), the Defendant is entitled to an offset against any judgment entered in Mr. Malmberg's favor for both past and future Social Security disability benefits paid to him on account of his incomplete quadriplegia. Turnball v. USAir, Inc., 133 F.3d 184, 188 (2d Cir. 1998); *see* also Ferrarelli v. United States, 1992 WL 893461 at *16 (E.D.N.Y.)(plain language of the FTCA requires application of CPLR § 4545(c) [renumbered as 4545(a) - by L. 2009, c. 494, pt. F, §§ 2, 3, eff. Nov. 12, 2009], New York's collateral source rule).

10.    No substantive preclusive effect of plaintiff's § 1151 benefits – plaintiff is receiving benefits from the Veterans Administration in connection with the injuries that resulted from his

November 4, 2004 surgery, pursuant to Title 38 U.S.C. §1151. That statute, entitled "Benefits for persons who are disabled by treatment or vocational rehabilitation," provides that:

> Compensation...shall be awarded for a disqualifying additional disability...of a veteran in the same manner as if such additional disability...were service-connected...[if]...the disability...was caused by hospital care, medical or surgical treatment, or examination furnished the veteran [in a VA facility]...and the proximate cause of the disability...was...carelessness, negligence, lack of proper skill, error in judgment, or similar instance of fault on the part of [the VA] in furnishing the hospital care, medical or surgical treatment, or examination; or...an event not reasonably foreseeable.

38 U.S.C.§1151(a)(1). The "fault"- based language of this veterans' compensation provision has suggested to some that a grant of benefits to a veteran under this statute would result in issue or claim preclusion in a subsequent FTCA civil action for damages arising from the same incident. That argument has been rejected, Littlejohn v. United States, 321 F.3d 915, 919 (9th Cir. 2003).

11.   Plaintiff has failed to establish by a preponderance of the evidence that the ACDF that was performed upon him was performed in a manner that breached the accepted standards of medical care and, furthermore, that any such breach was a proximate cause of his injuries.

Dated: March 19, 2010

                                        RICHARD S. HARTUNIAN
                                      United States Attorney
                                      Northern District of New York
                                      100 South Clinton Street
                                      Syracuse, New York 13261-7198

                             By:    /s/ William F. Larkin
                                      William F. Larkin
                                      Assistant U. S. Attorney
                                      Attorney for Defendant, United States
                                      Bar Roll No. 102013

cc:   Robert B. Nichols, Esq.