**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**CHARLES MALMBERG,**

                        v.                                              **5:06-CV-1042**
                                                                              **(FJS/TWD)**

**UNITED STATES OF AMERICA,**

                                        **Defendant.**
_____

**APPEARANCES**                                  **OF COUNSEL**

**HANCOCK ESTABROOK, LLP**              **ALAN J. PIERCE, ESQ.**
1500 AXA Tower I
Syracuse, New York  13221
Attorneys for Plaintiff

**OFFICE OF ROBERT B. NICHOLS**        **ROBERT B. NICHOLS, ESQ.**
716 Brisbane Building
403 Main Street
Buffalo, New York  14203
Attorneys for Plaintiff

**OFFICE OF THE UNITED**                  **WILLIAM F. LARKIN, AUSA**
**STATES ATTORNEY**
James T. Hanley U.S. Courthouse
& Federal Building
100 South Clinton Street
Syracuse, New York  13261
Attorneys for Defendant

**SCULLIN, Senior Judge**

**MEMORANDUM-DECISION AND ORDER**

**I.  INTRODUCTION**

        Currently before the Court are the parties' proposed post-bench trial findings of fact and

conclusions of law regarding damages.  *See* Dkt. Nos. 143, 144.

## II. BACKGROUND

On August 28, 2006, Charles Malmberg ("Plaintiff") filed a complaint pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b) and 2671 *et. seq.*, against the United States of America ("Defendant") for injuries sustained during a surgery he underwent on November 4, 2004, at Syracuse Veterans Administration Medical Center ("SVAMC"), in Syracuse, New York. *See* Dkt. No. 1 at ¶ 4. The operation was an anterior cervical discectomy with fusion ("ACDF").[1] *See* Dkt. No. 85 at 1. After the surgery, Plaintiff was diagnosed with C7 incomplete quadriplegia, neurogenic bladder and bowel. *See* Dkt. No. 143 at ¶ 10. In his complaint, Plaintiff asserted two causes of action. First, during Plaintiff's operation at SVAMC, Defendant "carelessly and negligently rendered medical and care and treatment to the plaintiff" that was "not in accordance with good and accepted medical practice." *See* Dkt. No. 1 at ¶ 10. Plaintiff alleged that Defendant's negligence was the direct and proximate cause of his permanent injury. *See id.* at ¶ 11. Second, prior to the operation, Defendant "failed to obtain the informed consent of the plaintiff to perform the surgery." *See id.* at ¶ 15.

The Court held a bench trial on April 12-14 and April 26, 2010, to determine the issue of liability. *See* Dkt. No. 100. At the conclusion of that trial, the Court held that Plaintiff had established, by preponderance of the evidence, that Defendant's actions caused his injury and that those actions were a deviation from the accepted standards of medical practice. *See* Dkt. No. 85 at 10. Subsequently, the Court held a three-day bench trial on December 3, 2012, December 4, 2012, and December 13, 2012, to determine the amount of damages.

---

[1] The surgery was to remove a degenerative disc and osteophytes causing an impingement at C5-C6. The ACDF is a surgical procedure performed to remove a herniated or degenerative disc in the cervical (neck) spine.

Prior to Plaintiff's surgery, Dr. Hunsinger was Plaintiff's primary care physician.[2] *See* Dkt. No. 138 at 80. During the damages trial, Dr. Hunsinger testified that Plaintiff's status had "significantly deteriorated" since 2010.[3] *See id.* at 81. Plaintiff hired Dr. Kenneth Reagles to develop a Life Care Plan ("LCP").[4] Defendant hired Dr. Peter Stickney to develop a LCP. *See* Dkt. No. 144 at 20. Plaintiff hired Dr. Daniel McGowan as a forensic economist to forecast future medical costs.[5] *See* Dkt. No. 139 at 81. Dr. McGowan used a life expectancy of 26 years. Defendant hired Dr. Spizman as a forensic economist to forecast future medical costs. Dr. Spizman used a life expectancy of 27 years. Both Dr. Reagles and Dr. Stickney provided two scenarios. *See* Dkt. No. 143 at 6. Each scenario was given a present value based on the assigned economist. Scenario #1 of Dr. Reagles' Life Care Plan cost $6,159,425.[6] Scenario #2 of Dr. Reagles' Life Care Plan cost $4,156,537.[7] Scenario #1 of Dr. Stickney's Life Care Plan cost $4,628,647. Scenario #2 of Dr. Stickney's Life Care Plan cost $3,504,161. *See* Dkt. No. 128.

---

[2] The record indicates that Dr. Hunsinger still is Plaintiff's primary care physician.

[3] For example, Dr. Hunsinger testified that Plaintiff's depression had increased, and he had developed a decubitis ulcer in his right ankle, and chronic constipation, required catheter usage, and treatment for chronic pain, and had increased spasticity and agoraphobia. *See* Dkt. No. 138 at 85-102.

[4] An LCP is an array or an itemization of all of the anticipated future health and rehabilitation goods and services that an individual with a disabling condition will probably need over the course of his lifetime.

[5] Dr. McGowan's calculations included (1) periodic evaluations, (2) therapeutic modalities, and (3) adaptive equipment.

[6] Scenario #1 is based on the assumption that Plaintiff will continue to reside in his own home and will require increased support as he ages, including round-the-clock in-home services commencing at age 62. *See* Dkt. No. 97-3 at 25.

[7] Scenario #2 is based on the assumption that, at age 62, Plaintiff will require the assistive services of a residential habilitation facility.

During the damages trial, Dr. Stickney compared both of Dr. Reagles' scenarios.  *See* Exhibits "SS" and "TT."

On May 6, 2013, Plaintiff submitted his proposed post-trial findings of fact and conclusions of law.  *See* Dkt. No. 143.  On the same day, Defendant submitted its proposed post-trial findings of fact and conclusions of law.  *See* Dkt. No. 144.

## III. DISCUSSION

### A. Federal Tort Claims Act

This action arises under the FTCA, which waives the United States' sovereign immunity from suits for personal injury damages caused by the "negligent or wrongful act or omission" of its employees "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."  28 U.S.C. § 1346(b); *see also Guccione v. United States*, 847 F.2d 1031, 1033 (2d Cir. 1988); *Hurwitz v. United States*, 884 F.2d 684, 686 (2d Cir. 1989); *Avakian v. United States*, 739 F. Supp. 724, 730 (N.D.N.Y. 1990).  The Government's liability pursuant to the FTCA is determined under New York law.  *See* 28 U.S.C. § 1346(b).

### B. Amount of damages

"In New York, '[a] plaintiff who has been injured by another's negligence is entitled to a sum of money that will 'justly and fairly' compensate [him] for all losses proximately caused by the wrongdoing, to restore [him], to the extent possible, to the position [he] would have been in had the wrong not occurred.  NYPJI 2:277.'"  *Dockery v. United States*, 663 F. Supp. 2d. 111, 121-22 (N.D.N.Y. 2009) (quoting *Kane v. U.S.*, 189 F. Supp. 2d 40, 52 (S.D.N.Y. 2002)); *Delano v. United States*, 859 F. Supp. 2d 487, 507 (W.D.N.Y. 2012) (citation omitted).

## C. Whether Plaintiff's total FTCA damages award is offset by prior VA Benefits ("§ 1151 payments")

Plaintiff argues that there should not be any offset based on his VA benefits. Plaintiff also asserts that "[a]ny award for future medical care should not be limited on the ground that because plaintiff is a veteran, he is entitled to free VA Medical care, hospitalization and institutionalization." *See* Dkt. No. 143 at 8. (citing *Ulrich v. Veterans Administration Hospital*, 853 F.2d 1078, 1084 (2d Cir. 1988)). To the contrary, Defendant contends that Plaintiff has the ability to gain special grants or receive free medications and, therefore, does not have the right to select a doctor or private hospital of his own choice for future medical needs. *See id.*

First, Defendant argues that New York CPLR § 4545(a) applies. *See* Dkt. No. 144 at 6. It states,

> In any action to recover damages for personal injury . . . where plaintiff seeks to recover for the cost of medical care, dental care, custodial care or rehabilitation services, loss of earning or other economic loss, evidence shall be admissible for consideration by the court to establish that any such past or future cost or expense was, or will, with reasonable certainty, be replaced or indemnified in whole or in part from any collateral sources such as insurance . . . social security . . . or . . . employee benefit programs . . .

*See id.*

Defendant states that, through April 30, 2013, Plaintiff has received $382,617.00 in 38 U.S.C. § 1151 benefits from the VA. *See id.* at 7 n.1. Defendant contends that this case is analogous to *Morgan v. United States*, 968 F.2d 200, 206-08 (2d Cir. 1992), rather than *Ulrich v. United States*, 853 F.2d 1078, 1082-83 (2d Cir. 1988). Defendant asserts that the Second Circuit in *Morgan* "held that the entire amount of a personal injury award under the Federal Tort Claims Act must be reduced by the entire amount of any VA benefits awarded to a plaintiff under Title

38 U.S.C. § 351 (now § 1151) for the same injury." *See* Dkt. No. 144 at 7. Therefore, "the total

amount awarded to [Plaintiff] must be reduced by the total amount of § 1151 benefits paid to him

by the VA up to the date of the award." *See id.* Additionally, Defendant states that an offset of

future benefits against any award of damages is unnecessary "because Title 38 U.S.C. § 1151(b)

requires that . . . [Plaintiff's] future 1151 benefits will cease until such time as the amount he

would have been paid in such benefits equals the dollar amount recovered in this lawsuit." *See*

*id.* at 8.

> 38 U.S.C. § 1151(a) provides compensation provided to a disabled person where

> *[t]he disability or death was caused by hospital care, medical or surgical treatment*, or examination furnished the veteran under any law administered by the Secretary, either by a Department employee or in a Department facility as defined in section 1701(3)(A) of this title, and the proximate cause of the disability or death was –

> (A) carelessness, *negligence*, lack of proper skill, error in judgment, or similar instance of fault on the part of the Department in furnishing the hospital care, medical or surgical treatment, or examination . . . .

38 U.S.C. § 1151(a)(1)(A) (emphasis added).

Here, Plaintiff wishes to rely upon the four-part holding in *Ulrich*. In *Ulrich*, plaintiff

was a 100% disabled veteran with service-related catatonic schizophrenia, who was later

rendered a paraplegic after a fall from a smoke stack while under psychiatric care at a VA

Hospital. *See Ulrich*, 853 F.2d at 1079. First, with regard to the pain and suffering, in *Ulrich*,

the rationale was that the plaintiff's prior wartime benefits were not equivalent to a pain and

suffering award. *See id.* at 1082. Second, with regard to the future medical expenses, the *Ulrich*

court stated that the plaintiff "was not obligated to seek medical care from the party whose

negligence created his need for such care simply because that party offers it without charge." *Id.*

at 1084.

Similar to this case, in *Ulrich*, there was a bifurcated non-jury trial. The *Ulrich* court found defendants liable for failure to supervise the plaintiff following admission to the Psychiatric Service of VA Buffalo. *See id* at 1079. However, in *Ulrich*, the set-off was improperly calculated with the pain and suffering award because the plaintiff had been receiving disability benefits under § 314 rather than under 38 U.S.C. § 351. *See id.* at 1082. The *Ulrich* court stated that "plaintiff's increased § 314 benefits are not the 'equivalent' of pain and suffering damages, a circumstance which might justify a set-off."[8] *Id.*

With regard to future medical expenses, the *Ulrich* court said that "any award for future medical expenses should not be limited on the ground that, as a veteran, plaintiff is entitled to free VA medical care, hospitalization, and institutionalization." *Id.* at 1084. The *Ulrich* court further stated that the plaintiff "ha[d] a right to select a doctor or private hospital of his own life choice for his future medical needs." *Id.* (citing *Feeley v. United States*, 337 F.2d 924, 934-35 (3d Cir. 1964); *Powers*, 589 F. Supp. at 1108-09; *Christopher*, 237 F. Supp. at 798-99).

Contrarily, in *Morgan*, an x-ray taken found a mass in the plaintiff's chest area. *See Morgan*, 968 F.2d at 201. Subsequently, the VA's hospital staff failed to perform a CAT scan. *See id.* This failure resulted in a delay of diagnosing the plaintiff with Hodgkin's disease. *See id.* During this delay, the plaintiff's tumor quadrupled in size. *See id.* Thus, the plaintiff had to undergo eight months of chemotherapy, during which he suffered debilitating side-effects. *See*

---

[8] Citing *Brooks v. United States*, 337 U.S. 49, 53-54, 69 S. Ct. 918, 920-21, 93 L. Ed. 1200 (1949) (indicating that set-off might be appropriate where tort damages are the "equivalent of elements taken into account in providing disability payments"); *Pike v. United States*, 652 F.2d 31, 34 (9th Cir. 1981) (set-off appropriate only where benefits are intended to compensate for same element of damages as FTCA award); *Mosley v. United States*, 538 F.2d 555, 561 (4th Cir. 1976) (same); *Hale v. United States*, 416 F.2d 355, 360-61 (6th Cir. 1969) (same); *Powers v. United States*, 589 F. Supp. 1084, 1107 (D. Conn. 1984) (same); *see also Christopher v. United States*, 237 F. Supp. 787, 799 (E.D. Pa. 1965) ("Certainly pain and suffering has no bearing on what disability rating a veteran will receive and could not be construed to be a duplication of benefits.").

-7-

*id.* First, the *Morgan* court explained that 38 U.S.C. § 351 was renumbered to § 1151 by Department of Veterans Affairs Codification Act, Pub. L. No. 102-83, § 5(a) (1991) ("1991 DVA Act"). Those "§ 351 payments" (now "§ 1151 payments") apply to veterans who are injured, or whose injuries are aggravated, through the fault of VA hospital staff.

Second, the *Morgan* court "remanded to the magistrate judge to permit recalculation of the damage award with a setoff of the statutory benefits against the total amount of the FTCA damages award." *Id.* at 202. The *Morgan* court found that the setoff provision of § 351 affected all elements of damages -- meaning, the entire award that a court grants. *See id.* at 203. The *Morgan* court explained that § 351 was fundamentally different from § 314 in that § 351 does not grant special benefits.[9] Further, the *Morgan* court stated that, "[o]n its face, § 351's requirement that the statutory payments be offset against 'the total amount included in [the FTCA] judgment' seems a relatively straightforward way of referring to the total amount of damages awarded pursuant to the FTCA claim for all components of the veteran's injury as a result of VA hospital malpractice." *Id.* at 206. Lastly, the *Morgan* court distinguished the *Ulrich* ruling:

> In sum, we read "the total amount included in such judgment" in § 351 to refer to the total amount of FTCA damages included in the judgment for any type of injury resulting from VA medical treatment. Our interpretation is consistent with prior dicta of this Court and the Supreme Court interpreting § 351. *See United States v. Kubrick*, 444 U.S. 111, 116 n.5, 100 S. Ct. 352, 356 n.5, 62 L. Ed. 2d 259 (1979) ("[u]nder 38 U.S.C. § 351, the benefits payments must be set off against the *damages awarded in tort*; and the increment in future monthly benefits is not paid until the aggregate amount of the benefits withheld equals the damages awarded" (emphasis added)); *Ulrich v. Veterans Administration Hospital*, 853 F.2d 1078, 1082 (2d Cir. 1988) (construing 38 U.S.C. § 314 as not authorizing setoff against plaintiff's pain and suffering award, *"unlike § 351"* (emphasis added)).

---

[9] Section 314 sets rates of wartime disability compensation for specified percentage levels of disability. *See* 38 U.S.C. § 1114.

*Id.* at 206-07.

Therefore, because the *Morgan* court distinguished the *Ulrich* holding regarding the set off of § 351 ("§ 1151") benefits from the total FTCA damages award, the Court will offset any award in this case by prior VA benefits, § 1151 payments, that Plaintiff has received up to the date of judgment.

**D. Whether Defendant's alternative LCP and corresponding economic analysis should be precluded**

Plaintiff states that on December 10, 2012, his counsel received an email from defense counsel which included what defense counsel referred to as "Spizman's revised report updated 12/6/12." *See* Dkt. No. 143 at 9. Plaintiff contends that Stickney's amended life plan was introduced into evidence over his objection. *See id.* Further, Plaintiff asserts that Defendant "ignored the Court's discovery deadline of August 1, 2012 but also had this 'alternative report' dated December 5, 2012 but didn't attempt to provide it to plaintiff's counsel until December 12, 2012[.]" *See id.* at 10. Plaintiff avers that he was prejudiced since he was prevented from deposing experts on the subject matter of their testimony. *See id.* at 11. Lastly, Plaintiff states "there can be no justification but for the late disclosure, and certainly if the Court were to even consider as relevant that certain services would be provided free by the VA, that would clearly be harmful to the plaintiff." *See id.*

To the contrary, Defendant argues that Dr. Stickney's revised report does not prejudice Plaintiff. *See* Dkt. No. 144 at 16-20.

Federal Rule of Civil Procedure 37(c)(1) provides that

[i]f a party fails to provide information . . . as required by Rule 26(a) or (e), the party is not allowed to use that information . . . to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless. . . .

Fed. R. Civ. P. 37(c)(1).

This rule is designed "to avoid 'surprise' or 'trial by ambush.'" *Am. Stock Exch., LLC v. Mopex, Inc.*, 215 F.R.D. 87, 93 (S.D.N.Y. 2002) (quoting *Transclean Corp. v. Bridgewood Servs., Inc.*, 77 F. Supp. 2d 1045, 1061 (D. Minn. 1999) (Rule 26(e)(2) "has a simple but important purpose; namely, to prevent [t]rial by ambush"), *aff'd in relevant part*, 290 F.3d 1364 (Fed. Cir. 2002)) (other citation omitted).

The sanction of preclusion under Rule 37(c)(1) is "'automatic' absent a determination of either 'substantial justification' or 'harmlessness.'" *Id.* (citations omitted). "'Substantial justification means "justification to a degree that could satisfy a reasonable person that parties could differ as to whether the party was required to comply with the disclosure request.""" *Id.* (quoting *Henrietta D. v. Giuliani*, No. 95 Civ. 0641, 2001 WL 1602114 at *5 (E.D.N.Y. Dec. 11, 2001)). The burden of proving substantial justification rests with the party that has failed to disclose information. *See id.* (citing *Wright v. Aargo Sec. Servs., Inc.*, 99 Civ 9115, 2001 WL 1035139, at *2 (S.D.N.Y. Sept. 7, 2001)).

Despite the "automatic" nature of Rule 37(c)(1), "the imposition of sanctions under the rule is a matter within the trial court's discretion." *Id.* (quoting *Jockey Int'l, Inc. v. M/V "Leverkusen Express"*, 217 F. Supp. 2d 447, 452 (S.D.N.Y. 2002)). Further, "[p]reclusion of evidence is generally a disfavored action." *Id.* (citation omitted). The preclusion of evidence not disclosed in discovery is "a drastic remedy and will apply only in situations where the failure to disclose represents . . . flagrant bad faith and callous disregard of the rules." *Johnson Elec. N. Am. Inc. v. Mabuchi Motor Am. Corp.*, 77 F. Supp. 2d 446, 458 (S.D.N.Y. 1999) (citations omitted).

Here, the Court has discretion to determine whether Defendant's late submission was harmless. *See Jockey Int'l, Inc.*, 217 F. Supp. 2d at 452. It cannot be said that Defendant exercised "flagrant bad faith" or a "callous disregard of the rules." *Johnson Elec. N. Am., Inc.*, 77 F. Supp. at 458. There is nothing in the record to show that Plaintiff was in any way prejudiced by the amended report of Defendant's economist, Dr. Spizman, over Dr. Stickney's two options. Further, it cannot be said that the Court's determination of whether to offset those services that the VA rendered free is harmful to Plaintiff. If the law dictates that there is an offset, or subtraction, of a certain amount that the VA has already provided to Plaintiff, then this is not harmful. Rather, it is what the Court is required to do in determining the overall FTCA damages award.

Therefore, to the extent that Plaintiff argues for preclusion of evidence under Rule 37 regarding Dr. Spizman's economic amendment to Dr. Stickney's LCP, the Court denies Plaintiff's claim and finds that the admission of this evidence causes no harm to Plaintiff.

**E. Whether Plaintiff should have to use the VA for medical care and services in the future**

Plaintiff contends that, "even if the [Defendant] were to provide some service free of charge to the veteran, the veteran is not obligated in any way to limit himself to whatever the VA System has to offer." *See* Dkt. No. 143 at 12. Additionally, Plaintiff argues that, "were the Court to deduct a setoff for possible prospective medical benefits, that setoff would, as a practical matter, unduly limit and virtually predetermine not only the kind of medical care necessary for the treatment of plaintiff's condition, but also the source of such medical care." *See id.* Lastly, Plaintiff "has not been satisfied with some of the subsequent care he has received by the VA" and has "expressed his desire to obtain care from the private sector." *See id.* at 13.

Although Defendant does not directly address Plaintiff's issue, Defendant asserts that, although Dr. Reagles, Plaintiff's Life Care Planner, provided an objectively reasonable itemized list outlining costs of future medical services and needs, Dr. Reagles' report "contains many items that are either not necessary or covered by grants and/or provided free of charge by the Department of Veterans Affairs." *See* Dkt. No. 144 at 19.

Here, the record clearly demonstrates that Dr. Hunsinger stated with a reasonable degree of medical certainty the nature of Plaintiff's future medical needs. Furthermore, Defendant made no objections regarding Dr. Hunsinger's testimony on the reasonableness of Dr. Reagles' LCP.

Q      Doctor, did there come a time on March the 9th of this year that you met with Dr. Reagles to review a life care plan, sir, for Mr. Malmberg?

A      Yes.

Q      And as a result of that meeting, did you give Dr. Reagles certain suggestions or changes that you felt would be appropriate?

A      Yes.

Q      And as a result of that, did he come up with a revised plan which you had a chance to review line by line, sir?

A      Yes.

Q      And I'm hopefully I'm going to save the Court, maybe make the Court please rather than go through each and every one of those entries, did you conclude, sir, in your opinion that the plan for Mr. Malmberg that was drawn up by Dr. Reagles was, in fact, a reasonable one?

A      Yes.

*See* Dkt. No. 138 at 119; *see also* Dkt. No. 139 at 18-19.

However, on cross examination, Defendant's counsel identified some items from Dr. Reagles' report that Plaintiff will not need.[10]  First, the VA already provides psychiatric care.

> Q        Yes, sir, are you aware of that, that Mr. Malmberg is satisfied with the care and treatment he's receiving from Dr. Thompson?
>
> A        He has expressed that it is helpful to him.

*See id.* at 125-26.

According to Scenario #2 of Dr. Reagles' LCP, the yearly cost of psychiatric care is $320 dollars, multiplied by 26 years is $8,320 for the duration of Plaintiff's life expectancy.[11]  *See* Dkt. No. 97-3 at 61.

Second, in reference to home health care with a price tag of $5,000 per evaluation, Dr. Hunsinger admitted that this service was already being provided to Plaintiff free of charge.

> A        I believe that Mr. Malmberg will need someone who helps to coordinate and plan his care.  Dr. Reagles is the first life care planner I was ever exposed to.  I didn't know that that specialty existed.  So –
>
> Q        I'm sorry go ahead, Doctor.
>
> A        Well, the services of planning for care are essential.
>
> Q        And he's getting those services now through what's called HBPC home-based primary care, that organization is providing those services to him, currently; is that correct?
>
> A        Yes.
>
> Q        That's free of charge?

---

[10] Prior to subtracting services that the VA provides free of charge, the Court finds that Dr. Reagles' Scenario #2 is the most reasonable baseline – i.e., the rational monetary starting point – for the FTCA damages award.  *See infra.*

[11] Plaintiff requires periodic psychiatric evaluation to assess (a) the relative utility of psychopharmacological agents and modify prescriptions as necessary, including adding new prescriptions; and (b) the nature and severity of Plaintiff's emotional response to his disablement, characterized most prominently by depression, and to evaluate the potential utility of personal counseling and other interventions, e.g., antidepressants.

A    Yes.

*See id.* at 126.

According to Dr. Reagles' LCP, the life care planner re-evaluation costs $5,000 per evaluation, which is required every three to five years. Assuming the most liberal frequency of every three year, then three divided into 26 equals 8.667, and multiplied by $5,000 equals $43,333.33. *See* Dkt. No. 97-3 at 62.

In addition to the medications that the VA provides free, a dietician and nutritionist from the HBPC, palliative physical activity,[12] and assistive technology consultation[13] are provided free of charge. Therefore, the Court will subtract the cost of these items from the total FTCA award.

First, medications, in accordance with Dr. Reagles' Scenario #2, cost $18,131 yearly. *See* Dkt. No. 97-3 at 66. This sum multiplied by 26 years equals $471,406. Second, a dietician/nutritionist has an initial cost of $90 dollars, then counseling that costs $1,430, per year. *See* Dkt. No. 97-3 at 68. Therefore, the calculation is $90 + ($1,430 x 26), which equals $37,270. Third, the price tag on palliative physical activity consists of a joining fee ($38), an ongoing facility fee ($410), an ongoing locker rental ($84), and a personal trainer ($1,080). *See id.* at 69. The total yearly amount, $1,612, is then multiplied by 26 years to equal $41,912.

Further items that Plaintiff will have at his disposal from the VA include wounds management supplies ($3,172), urinary incontinence supplies ($367,198), bowel incontinence

---

[12] Palliative physical activity is conducted in lieu of ongoing physical therapy. It is carried out within the auspices of a sports medicine facility or health club to maintain range of motion, muscle tone, strength and endurance, including periodic sessions with a personal trainer to be sure Plaintiff is using the equipment properly and addressing issues amenable to exercise.

[13] Assistive technology consultation includes periodic monitoring of technology adaptations (adaptive and assistive devices) and their utility. This consultation provides technical assistance in the selection, procurement, initiation, maintenance, and effective utilization of all technology devices.

supplies ($14,924), a vanilla boost (no price given on Dr. Reagles' LCP Scenario #2), case management services ($121,056), and a spinal injury support group ($67,600).  *See id.* at 129-132.  Thus, the Court will subtract the cost of these items as well, which are set forth in Dr. Reagles' LCP Scenario #2, from the total FTCA award.

However, as discussed below, because the record indicates that the VA does not provide the following integral services free of charge – that is, skilled registered nurses ($2,514,720) and home health aide services ($681,408)[14] – those items will *not* be offset from the final FTCA award.

**F.  Whether there is reasonable certainty that the VA will provide Plaintiff with home health aides in the future**

Plaintiff states that both Dr. Hunsinger and Dr. Reagles decided that Plaintiff "needs the assistance of home health aides three hours a day, seven days a week" until he reaches the age of 62.  *See* Dkt. No. 143 at 14.  At age 62, the projection required "home health care aides 18 hours a day, seven days a week."  *See id.*  Plaintiff asserts that "any suggestion that [he] would automatically receive the necessary free home health aides as specified in the life care plan free from the [Defendant] is simply not accurate."  *See id.* at 16.  Rather, Plaintiff contends that "there is certainly no guarantee or reasonable certainty that [he] will receive throughout his lifetime the needed aides and services that Dr. Hunsinger testified will be necessary."  *See id.* at 17.

Defendant states that with regard to home health aide services, Plaintiff "has expressed no recent dissatisfaction with those services."  *See* Dkt. No. 144 at 17.  Therefore, there is no need to cease with the services that the VA provides.

---

[14] The Hospice Association of America ("HAA") provides the home health aide services.  They are not employees of the VA and therefore, in essence, they are contract employees.

Although the record reflects that the VA has provided home health aide services to include skilled registered nurses to come to Plaintiff's home, it does not show a continual and concrete schedule upon which Plaintiff can depend in the future. Admittedly, the record does not reflect that the services have been subpar or deficient in any way. However, because the record demonstrates that the skilled nurses who come to Plaintiff's house are not actually staffed and paid for by the VA, the VA does not directly provide care for Plaintiff. Rather, the HAA provides the services. Consequently, these HAA contract employees caring for Plaintiff at home are too attenuated from, and not under the control of, the VA administration.

Therefore, the Court will not offset the costs of skilled registered nurse services ($2,514,720), and home health aides ($681,408), which are not provided for or covered directly by the VA.

## G. Whether Defendant's evidence should be precluded if it was not evidence approved by Dr. Hunsinger

Plaintiff contends that Dr. Reagles only finalized his life care plan after Dr. Hunsinger, Plaintiff's primary physician, made some changes "commensurate with the expectations of what [Plaintiff] would need in the future." *See* Dkt. No. 143 at 18. Plaintiff contends that the alternative life plan that Dr. Stickney provided is "totally lacking in foundation." *See id.* at 19. Plaintiff asserts that Dr. Stickney did not talk to a physician in this case. *See id.* Plaintiff argues that both defense counsel and Dr. Stickney knew that a "vocational rehabilitation expert" was not qualified to express an opinion on his future medical needs. *See id.* Defendant did not address this argument in its submissions. *See* Dkt. No. 144.

The Federal Rules of Evidence set forth the standard for admissibility of expert testimony: "A witness who is qualified as an expert by knowledge, skill, experience, training, or

education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue . . . ."  Fed. R. Evid. 702.  The trial judge is to act as a "gatekeeper" with respect to expert testimony to ensure that such testimony is both relevant and reliable.  *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589-91 (1993).  This rule applies not only to scientific knowledge, but also to technical or other specialized knowledge.  *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999).  The determination as to the relevance and reliability of such evidence is committed to the sound discretion of the trial court.  *See id.* at 158.

*Daubert* sets forth specific factors, such as "testing, peer review, error rates, and 'acceptability' in the relevant scientific community," which the trial court may consider in determining reliability.  *Kumho*, 526 U.S. at 141.  However, the *Daubert* test is flexible and its "list of specific factors neither necessarily nor exclusively applies to all experts or in every case." *Id.*  To this end, the Supreme Court has more generally explained that trial courts should "make certain that an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  *Id.* at 152.

Furthermore, the trial judge must insure that the expert's opinion is based upon "more than subjective belief or unsupported speculation . . . . Proposed testimony must be supported by appropriate validation – *i.e.*, 'good grounds,' based on what is known."  *Daubert*, 509 U.S. at 590.  Expert testimony is reliable where it has "a traceable, analytical basis in objective fact . . . ."  *Bragdon v. Abbott*, 524 U.S. 624, 653 (1998) (citing *General Elec. Co. v. Joiner*, 522 U.S. 136, 144-45, 146, 118 S. Ct. 512, 518, 519, 139 L. Ed. 2d 508 (1997)).  Finally, it is within the trial court's discretion to craft reasonable criteria to be used to determine reliability in a particular case and whether the proposed testimony meets those criteria.  *See Kumho*, 526 U.S. at

158 (decision to exclude expert evidence within trial court's discretion where based on "failure to satisfy either *Daubert's* factors *or any other* set of reasonable reliability criteria").

An expert witness testifying about future damages "'must possess the requisite skill, training, knowledge or experience to ensure that [the] opinion rendered is reliable.'" *Smith v. M.V. Woods Construction Co., Inc.*, 309 A.D.2d 1155, 1156 (4th Dep't 2003) (citing *Daum v. Auburn Mem. Hosp.*, 198 A.D.2d 899, 899 ([4th Dep't ] (1993)). A vocational rehabilitation expert is not qualified "to express an opinion on . . . future medical expenses." *Id.* Future medical expenses are within the expertise of an economist, but only to the extent that the opinion supports specific cost assessments. *See Strangio v. N.Y. Power Auth.*, 275 A.D.2d 945, 946-47 (4th Dep't 2000). If an expert's opinion is not properly founded, damages based on that opinion are against the weight of evidence. *See Smith*, 309 A.D.2d at 1157.

The record demonstrates that Dr. Reagles and Dr. Stickney, both "vocational rehabilitation experts," laid sufficient foundation to offer testimony before the Court. Further, Dr. Reagles, who has the same qualifications as Dr. Stickney, expressed an opinion as to Plaintiff's future medical needs. The testimonies of both life care planners were reliable and relevant. Therefore, the Court finds that Dr. Stickney's plan was based on a proper foundation.

## H. Whether Plaintiff is entitled to a monetary award that both compensates him for his injury suffered along with his pain and suffering

Plaintiff asserts that he is entitled "to recover monetary damages for his pain and suffering, including loss of enjoyment of life, from the time that he was injured until his death." *See* Dkt. No. 143 at 20. Plaintiff argues that in determining the amount of pain and suffering, "the Court may properly consider the effect of the injuries on [Plaintiff's] capacity to lead a normal life." *See id.* Plaintiff provides the Court with cases for "guidance and assistance"

involving other plaintiffs that were rendered quadriplegic. *See id.* at 22.[15] Additionally, Plaintiff

provides the Court with other cases that do not involve a quadriplegic plaintiff as well.[16] Lastly,

Plaintiff, citing CPLR 4111, contends that New York law regarding damages requires each

verdict to be itemized. *See id.* Plaintiff desires that the Court create two awards. First, an award

for pain and suffering from the date of the injury, November 4, 2004, to the date of the verdict.

*See id.* Second, an award for pain and suffering from the date of verdict until Plaintiff's life

expectancy.[17] *See id.*

Defendant concurs that "a plaintiff is entitled to a sum of money that will justly and fairly

compensate him for those losses proximately caused by negligence, to restore him to the position

he would have been in had the wrong not occurred." *See* Dkt. No. 144 at 24. Defendant "does

not dispute that [Plaintiff] suffered serious injuries as the result of his surgery on November 4,

2004." *See id.* at 28-29. Defendant asserts that awards and judgments for pain and suffering

based on quadriplegia vary from $500,000 to $1,490,000. *See id.* Further, Defendant states that

the "amount of the award to be made by this Court must reflect a deduction for the total amount

---

[15] *See Saladino v. American Airlines,* Nos. 11-754(L), 11-907(CON), 11-1330(XAP), 2012 WL 4902633 (2d Cir. Oct. 17, 2012) (a $15 million dollar award did not deviate materially from reasonable compensation); *see Barnhard v. Cybex Int'l, Inc.*, 55 A.D.3d 1348 (4th Dep't 2008) (award of $3 million for past pain and suffering and $9 million for future pain and suffering); *see Savillo v. Greenpoint Landing Assocs.*, New York Co. Index 114418/07, 2011 N.Y. Slip Op 31950, 6/6/11) (award of $10 million for past pain and suffering and $25 million for future pain and suffering); *see McMillan v. City of New York*, No. 03-CV-6049, 08-CV-2887, 2008 WL 4287573 (E.D.N.Y. 2008) (award of $4 million for past pain and suffering and $7.5 million for future pain and suffering).

[16] *See Cruz v. Long Island R.R. Co.*, 22 A.D. 3d 451 (2d Dep't 2005); *Miraglia v. H&L Holding Corp.*, 36 A.D. 3d 456 (1st Dep't 2007); *Bissell v. Town of Amherst*, 56 A.D. 3d 1144 (4th Dep't 2008); *see Ruby v. Budget Rent-A-Car-Corp.*, 23 A.D. 3d 257 (1st Dep't 2005); *Okraynets v. Metro. Transp. Auth.*, 555 F. Supp. 2d 420; *Tenudo v. Lederle Labs.*, # 1134/81, 2010 WL 625223 (N.Y. Sup. Feb. 17, 2010) (Table) (F.N.3), 26 Misc.3d 1225 (Sup. Ct. 2010).

[17] As noted, Plaintiff's life expectancy, according to Dr. Reagles, is 26 years.

of 38 U.S.C. § 1151 benefits paid to plaintiff as of the date of judgment." *See id.* at 30.[18] However, Defendant contends that Plaintiff "will have future medical care expenses but not to the extent claimed by Dr. Reagles." *See id.* In sum, Defendant avers that "[a] comparable award range for pain and suffering would be between $500,000 and $1,500,000, less the offset required by 38 U.S.C. § 1151." *See id.*

An award of damages for future pain and suffering must be reasonably certain. Future medical expenses must be established to a reasonable degree of medical certainty. Courts determine damages in FTCA actions according to the law of the state in which the tort occurred. *See Richards v. United States*, 369 U.S. 1, 11 (1962). Generally, under New York law, a plaintiff may recover his loss of earnings, medical expenses, and mental and physical pain and suffering. *See* N.Y. Jur. 2d *Damages* § 57, at 102-03 (1984).

There is no precise rule for determining pain and suffering, and a trier of fact is bound by a standard of reasonableness in light of all the evidence. *See Paley v. Brust*, 21 A.D.2d 758, 758, 250 N.Y.S. 2d 356, 357 (1st Dep't 1964). Courts may award "fair and just compensation for any injuries proximately caused by the negligence of the Government's employees." *Goldstein v. United States*, 9 F. Supp. 2d 175, 188 (E.D.N.Y. 1998). "[P]rior verdicts may guide and enlighten the court and, in a sense, may constrain it." *Senko v. Fonda*, 53 A.D. 2d 638, 639, 384 N.Y.S. 2d 849, 851 (2d Dep't 1976) (citation omitted); *see also, Corbin v. Grand Union Co.*, No. 96 CIV. 4626, 1997 WL 739583, *10 (S.D.N.Y. Nov. 26, 1997) (examining New York cases to determine appropriate compensation for past and future pain and suffering).

When considering future pain and suffering, any award of damages must be reasonably certain. *See Furey v. United States*, 458 F. Supp. 2d 48, 56 (N.D.N.Y. 2006) (citation omitted);

---

[18] Through April 30, 2013, Plaintiff has received $382,617.00 in 38 U.S.C. § 1151 benefits and, moving forward, will receive monthly benefits under 38 U.S.C. § 1151 in the amount of $7,131.

*Delano*, 859 F. Supp. 2d at 506 (citation omitted).  Consequences which are contingent, speculative, or merely possible are not proper to consider in ascertaining the damages.  *See Strohm v. New York, L.E. and W. R.R. Co.*, 96 N.Y. 305, 306 (1884).  "It is not enough . . . even that they are likely to so develop."  *Id.*  The reasonable certainty test applies to worsening conditions.  *See Streng v. Frank Ibert Brewing Co.*, 50 A.D. 542, 544 (2d Dep't 1900).

Section 4111 of the CPLR governs the need for an itemized verdict in a medical malpractice case

> In all actions seeking damages for medical . . . malpractice . . . the court shall instruct the jury that if the jury finds a verdict awarding damages it shall in its verdict specify the applicable elements of special and general damages upon which the award is based and the amount assigned to each element, including but not limited to medical expenses . . . loss of earnings, impairment of earning ability, and pain and suffering.  In all such actions, each element shall be further itemized into amounts intended to compensate for damages to be incurred in the future.  In itemizing amounts intended to compensate for the total amount of damages for each such item.  In itemizing amounts intended to compensate for future pain and suffering, the jury shall return the total amounts of damages for future pain and suffering and shall set forth the period of years over which such amounts are intended to provide compensation.  In itemizing amounts intended to compensate for future economic and pecuniary damages other than in wrongful death actions, the jury shall set forth as to each item of damage, (i) the annual amount in current dollars, (ii) the period of years for which such compensation is applicable and the date of commencement for that item of damage, (iii) the growth rate applicable for the period of years for the item of damage, and (iv) a finding of whether the loss or item of damage is permanent.

N.Y. C.P.L.R. § 4111

Here, the record is clear that Plaintiff has suffered the following:

1. He has lost the ability to stand, walk, or use his legs.
2. He has very limited use of his hands, and what he has is diminishing as time passes.
3. He suffers from daily uncontrollable spasms in which his legs uncontrollably bounce around.
4. He has incontinence of urine requiring multiple self-catheterizations daily causing spillage of urine, periodic urinary tract infections, and repeated soling of his clothes and bedding.

5. He has bowel incontinence resulting in accidents in which he soils his clothes and bedding.
6. He has had significant long-standing decubitus ulcers which he will be at risk for all of his life.
7. He has frequent bouts or episodes of constipation and diarrhea and abdominal pain.
8. He has significant daily physical pain requiring daily pain medications to help partially control his pain.
9. The medications he takes affect his ability to concentrate and impact his ability to remain alert.
10. He has loss of sexual function.
11. He has significant psychological issues because of all of his physical disabilities. Psychological problems include frequent nightmares, constant fear of having "accidents" concerning his bladder and his bowel resulting in his being fearful of leaving his home, being fearful of getting fat and not being able to operate his wheelchair, even though as the Court knows, he has been unable to eat as any normal person would do, being consumed by his disabilities, and ongoing depression.
12. He has lost his independence and must rely on others for many of the most basic needs.
13. He has difficulty maneuvering his wheelchair even in his own home and is forced to deal with accessibility problems on a daily basis.
14. He has to face the daily multiple issues that a catastrophically injured person experiences that able-bodied individuals often do not appreciate and ignore.

*See* Dkt. No. 143 at 21-22.

Prior similar cases should be a basis for the Court's damages award. *See Goldstein*, 9 F. Supp. 2d at 188. As evidenced above, the significant changes to Plaintiff's life are severe and real. They are not, in any sense, mere speculation. Unequivocally, Plaintiff's injuries are permanent, devastating, and catastrophic. The range in New York is normally between $500,000 and $1,500,000 dollars for a pain and suffering award. Therefore, the Court will award Plaintiff $500,000 for past pain and suffering and $1,500,000 for future pain and suffering.

**I. Whether Plaintiff is entitled to an award for future medical-related costs**

Plaintiff argues that "there is properly a claim for future medical-related costs associated with [his] catastrophic injuries." *See* Dkt. No. 143 at 28. Plaintiff states that, if the Court were to accept Dr. Reagles' life care plan, then the only remaining determination is whether to follow Scenario #1 or Scenario #2. *See id.* Further, Plaintiff asserts that the "calculations done by Dr.

McGowan are supported by the evidence" and "should be adopted by the Court in making an appropriate award for future medical-related costs[.]" *See id.*

Defendant addresses pecuniary damages, including "medical expenses, lost earnings, and the cost of care." *See* Dkt. No. 144 at 24. Defendant asserts that Plaintiff "makes no claims for lost earnings." *See id.* For future medical expenses, Defendant states that Mr. Stickney's LCP contains eleven categories of future care needs.[19] *See id.* at 25. With regard to the cost of care, Defendant states that "follow-up care, therapeutic modalities, wheelchair accessory/maintenance, aides for independent function, and potential surgeries/procedures may be considered costs of medical care/need to which plaintiff may be entitled to an award" whether or not Veterans Affairs provides them.[20] *See id.* Defendant argues that all home health aide services (H/HHA) are provided by independent contractors, not Department of Veterans Affairs employees. *See id.* at 26. Defendant contends that "any modifications required to make [Plaintiff's] home more wheelchair accessible are covered by the Department of Veterans Affairs grants."[21] *See id.* at 27.

---

[19] Dr. Stickney's eleven categories include (1) follow-up care, (2) therapeutic modalities, (3) mobility needs, (4) wheelchair accessory/maintenance (5) diagnostic evaluations, (6) medication, (7) aides for independent function, (8) transportation needs, (9) supply description, (10) home/facility care recommendation, and (11) potential surgeries/procedures. However, Defendant argues that five of these categories consist of "generic medical expenses" that the Veterans Administration already provides free of charge and, therefore, should be stricken from Plaintiff's total compensation. *See* Dkt. No. 144 at 25.

[20] Defendant cites what Mr. Stickney's LCP included: (1) Follow-up care – psychologist, one-time cost $6,336; (2) therapeutic modalities – physical therapy, occupational therapy, and health club membership – annual cost of $962.15; (3) wheelchair accessory maintenance – backpack and protective gloves – annual cost of $84.31; (4) aides for independent function – medi alert call button, one-time cost of $55.00, and (5) potential surgeries/procedures – a one-time cost for contractual release of $4,383 and annual costs of bowel impaction treatment and miscellaneous hospitalizations of $1,952.30.

[21] Defendant states that Plaintiff is eligible for a special adaptive housing grant of $64,960 to assist with his adaptive housing needs and, additionally, entitled to $5,600 for bathroom and home modifications.

Further, Defendant states that Plaintiff has "failed to establish with reasonable certainty that he will remain in his current home." *See id.* Defendant contends that "any separate award for housing modifications would not be justified." *See id.* Defendant contends that the Court should use either Scenario #1 or Scenario #2 of Dr. Stickney's LCP. Present value for Scenario #1 is $233,825. *See id.* at 28. Present value for Scenario #2 is $221,927. *See id.*

As with a pain and suffering award, reasonable certainty applies to future medical expenses. *See Askey v. Occidental Chem. Corp.*, 102 A.D. 2d 130, 137 (4th Dep't 1984). If a plaintiff is seeking future medical expenses as an element of consequential damages, he must establish with a degree of reasonable medical certainty through expert testimony that he will incur such expenses. *See id.; Ivory v. Int'l Bus. Machs. Corp.*, 2012 WL 5679778, *3-*4 (N.Y. Sup. Ct. Broome Cnty. Nov. 15, 2012).

First, the record indicates that the testimony of both Dr. Reagles and Dr. Stickney were given with reasonable certainty, along with the forensic economists who verified the LCPs. Second, the Court disagrees with Plaintiff's assertion that the only way to make him whole is to disassociate completely and detach from any service that the VA can provide, especially those which he is currently using and are free-of-charge. Third, the Court will adopt Dr. Reagles' Life Care Plan ("LCP"), Scenario #2, dated June 28, 2011, which was last revised March 2012. Therefore, the starting sum for a future medical award is $4,156,537, the amount calculated in Dr. Reagles' Scenario #2.[22]

**J. Renewal of Plaintiff's motion to amend the *ad damnum* clause**

---

[22] This is the amount before offsetting prior VA benefits, VA services which are free-of-charge, and adding the two pain and suffering awards.

Plaintiff contends that the Court has now had an opportunity "to hear and see various experts testify" and this constitutes new evidence of Plaintiff's deterioration that was not reasonably foreseeable. *See* Dkt. No. 143 at 30. Plaintiff argues that if his primary care physician could not have predicted his level of deterioration, then certainly he could not have reasonably foreseen it. *See id.* at 31. Thus, Plaintiff contends that the Court "now has sufficient evidence to appreciate how unfair and illogical it would be to not grant the renewal of the motion to raise the ad damnum clause." *See id.* Plaintiff contends that it is now clear that "the original claim for $6,000,000 was grossly inadequate." *See id.* Plaintiff argues that the Court "has discretion to increase the amount of damages requested in the ad damnum clause, even when motion is made after verdict." *See id.* at 32-33.

Plaintiff states that

[t]he bottom line is [he] has already been victimized once by the Government, and there is simply no logical reason to victimize [him] a second time because of his lawyer's inadvertent moderation and his inability to be able to foresee any more than his treating physician's ability to foresee the future deterioration of [his] medical condition and the associated increased medical-related needs and costs associated with those needs or that the Courts are now approving larger awards for pain and suffering that in 2006 would have been considered as excessive.

*See id.* at 33.

The Defendant states that the Court previously addressed this argument. *See* Dkt. No. 144; *see Malmberg v. United States*, No. 5:06-CV-1042 (FJS/TWD), 2012 WL 4953091 (N.D.N.Y. Oct. 15, 2012).

When a plaintiff seeks to amend his *ad damnum* clause to increase the amount he sought in his administrative complaint, a court may not substitute the liberal pleading requirements of Rule 15 of the Federal Rules of Civil Procedure for the narrower requirements of § 2675(b). *See O'Rourke v. E. Air Lines, Inc.,* 730 F.2d 842, 856 (2d Cir. 1984), *abrogated on other grounds*

*by Salve Regina Coll. v. Russell,* 499 U.S. 225 (1991) (citation omitted).  28 U.S.C. § 2675(b)

provides that

> (b) Action under this section shall not be instituted for any sum in excess of the
> amount of the claim presented to the federal agency, except where the increased
> amount is based on newly discovered evidence not reasonably discoverable at the
> time of presenting the claim to the federal agency, or upon allegation and proof of
> intervening facts, relating to the amount of the claim.

28 U.S.C. § 2675(b).

It is well-established that " '[t]he burden of establishing . . . "newly discovered evidence"

or "intervening facts" . . . rests on the claimant plaintiff.' " *Lowry v. United States*, 958 F. Supp.

704, 710 (D. Mass. 1997) (quotation and other citations omitted).  In canvassing the case law to

determine the meaning of "newly discovered evidence" and "intervening facts," the *Lowry* court

noted that the general theme was foreseeability.  *See id.* at 711.  Thus, if the condition was

reasonably foreseeable at the time the plaintiff filed his administrative claim, the court will not

allow him to increase the *ad damnum* clause.  *See id.*  Furthermore, courts will only allow an

increase in the *ad damnum* clause if the plaintiff was reasonably diligent in attempting to

discover those facts that were discoverable before filing his administrative claim.  *See id.*

In *O'Rourke*, the Second Circuit stated that

> [t]he FTCA, as a statute waiving immunity, must be complied with strictly. . . . If
> plaintiff were allowed to amend his *ad damnum* clause based upon the minimal
> showing he made in the district court, we would, in effect, be substituting the
> liberal pleading requirements of Federal Rule of Civil Procedure 15 for the
> narrower requirements of § 2675(b).  This we may not do.

*O'Rourke*, 730 F.2d at 856.

Here, the Court previously denied Plaintiff's motion to amend the *ad damnum* clause.

*See Malmberg v. United States*, No. 5:06-CV-1042 (FJS/TWD), 2012 WL 4953091 (N.D.N.Y.

Oct. 15, 2012).  There is no evidence from the record, specifically in reviewing the transcript of

the damages trial, that Plaintiff should be able to change the specific amount of damages he claims. In fact, there is enough in the record to determine (1) the total amount of the FTCA award; (2) the offset for prior VA benefits, the § 1151 (or § 351 payments); (3) the offset for services that the VA provided free-of-charge; (4) the offset for those medical services/goods that Dr. Stickney found as "generic" medical services; and (5) enough facts and precedent to guide the Court in determining amounts for past pain and suffering and future pain and suffering.

For the above-stated reasons, the Court denies Plaintiff's motion to amend the *ad damnum* clause.

## K. Final Calculation

(1) Baseline starting point is $4,156,537 (Dr. Reagles' Scenario #2)

(2) The prior VA benefits ("§ 1151 benefits") are subtracted out ("offset"). From the record, the starting point is April 30, 2013. Thus, proceeding forward,
    a.  8 months in 2013; therefore, 8 x $7,131 = $57,048
    b.  8 months in 2014; therefore, 8 x $7,131 = $57,048
          i.  Total = $114,096
    c.  Prior benefits received before April 30, 2013 = $382,617
    d.  Total = $496,713
          i.  Therefore, $4,156,537 - $496,713 = $3,659,824

(3) The future medical care / benefits provided by the VA are subtracted out.
    a.  $8,320 (psychiatric care)
    b.  $43,333.33 (life care planner re-evaluation)
    c.  $471,406 (medications)
    d.  $39,520 (dietician/nutritionist)
    e.  $41,912 (palliative physical activity)
    f.  $3,172 (wounds management supplies)
    g.  $367,198 (urinary incontinence supplies)
    h.  $14,924 (bowel incontinence supplies)
    i.  $121,056 (case management supplies)
    j.  $67,600 (spinal injury support group)
          i.  Total = $1,176,191.33
          ii.  Therefore, $3,659,824 - $1,176,191.33 = $2,483,632.67

(4) The "generic medical services," according to Dr. Stickney, are subtracted out.
    a.  $6,336 (follow-up care – psychologist, one-time cost)

    b. $962.15 (therapeutic modalities – physical therapy, occupational therapy, and health club membership – annual cost)

    c. $84.31 (wheelchair accessory maintenance – backpack and protective gloves – annual cost)

    d. $55.00 (aides for independent function – medi alert call button, one-time cost)

    e. $4,383 (potential surgeries/procedures – a one-time cost for contractual release)

    f. $1,952.30 (potential surgeries/procedures – annual costs of bowel impaction treatment and miscellaneous hospitalizations)

        i. Total = $13,772.76

        ii. Therefore, $2,483,632.67 - $13,772.76 = $2,469,859.91

(5) The two pain and suffering awards are added

    a. Total = $2,000,000 ($500,000 for past pain and suffering and $1,500,000 for future pain and suffering)

        i. Therefore, $2,469,859.91 + $2,000,000 = $4,468,859.91

(6) Final total = ***$4,468,859.91***


## IV. CONCLUSION

Accordingly, for the above-stated reasons, the Court hereby **ORDERS** that the Clerk of the Court shall enter judgment in favor of Plaintiff in the total amount of $4,468,859.91 as set forth in this Memorandum-Decision and Order and close this case, and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**


Dated: August 21 , 2014
     Syracuse, New York


_____
Frederick J. Scullin, Jr.
Senior United States District Court Judge