**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**CHARLES MALMBERG,**

                                   **Plaintiff,**


               **v.**                                      **5:06-CV-1042**
                                                              **(FJS/TWD)**

**UNITED STATES OF AMERICA,**

                                   **Defendant.**
_____

**APPEARANCES**                              **OF COUNSEL**

**OFFICE OF ROBERT B. NICHOLS**          **ROBERT B. NICHOLS, ESQ.**
716 Brisbane Building
403 Main Street
Buffalo, New York 14203
Attorneys for Plaintiff

**HANCOCK ESTABROOK, LLP**              **ALAN. J. PIERCE, ESQ.**
100 Madison Street, Suite 1500
Syracuse, New York 13202
Attorneys for Plaintiff

**OFFICE OF THE UNITED**                 **WILLIAM F. LARKIN, AUSA**
**STATES ATTORNEY**                      **KAREN F. LESPERANCE, AUSA**
James Hanley U.S. Courthouse
& Federal Building
100 South Clinton Street
P.O. Box 7198
Syracuse, New York 13261-7198
Attorneys for the United States

**SCULLIN, Senior Judge**

### MEMORANDUM-DECISION AND ORDER

### I. INTRODUCTION

        Pending before the Court are the parties' submissions, *see* Dkt. Nos. 161-166, filed in light

of the Second Circuit Court of Appeals' decision, affirming in part and vacating in part this Court's

decision and remanding the case for further proceedings.  *See Malmberg v. United States* ("*Malmberg IV*"), 816 F.3d 185 (2d Cir. 2016).

## II. BACKGROUND

Plaintiff commenced this action against Defendant pursuant to the Federal Tort Claims Act ("FTCA") in 2006, following surgery in 2004 to repair a herniated disc at the Syracuse Veteran's Administration Medical Center ("VA"), which rendered him a quadriplegic.  *See* Dkt. No. 1; Dkt. No. 153 at 4.  Specifically, following the surgery, Plaintiff was diagnosed with C7 incomplete quadriplegia and neurogenic bladder and bowel.  *See* Dkt. No. 143 at ¶ 10.

In April 2010, this Court held a bench trial to determine the issue of liability and found Defendant liable.  *See Malmberg v. United States* ("*Malmberg I*"), 814 F. Supp. 2d 159, 167 (N.D.N.Y. 2011).  Subsequently, in December 2012, this Court held a bench trial to determine the amount of damages.  *See Malmberg v. United States* ("*Malmberg III*"), No. 5:06-CV-1042, 2014 WL 4184737 (N.D.N.Y. Aug. 21, 2014).  Following *Malmberg III*, the Court awarded Plaintiff damages in the amount of $4,468,859.91.  *See id.* at *15-*16.  Specifically, the Court awarded Plaintiff $500,000 for past pain and suffering, $1.5 million for future pain and suffering, and $2,459,859.91 in future economic damages.  *See Malmberg III*, at *12, *15.  The Court offset the economic damages award for future medical care by subtracting an amount for medical care and supplies that the VA would provide for free.  *See id.* at *5, *15.  However, the Court declined to offset the economic damages award for the costs of home health services, for which the VA paid although third-party contractors provided those services.  *See id.* at *8.  Finally, the Court denied Plaintiff's renewed motion to increase his *ad damnum* clause from $6 million to $25 million.  *See id.*

at *15.

Plaintiff appealed the Court's damages award, arguing that the Court had

> abused its discretion by (1) offsetting the award for future medical
> care and benefits by subtracting out for services that could be
> provided by the VA for free, thus forcing him to receive medical
> services from his tortfeasor rather than choosing his own medical
> providers in the future; (2) denying his motion to amend his ad
> damnum clause to increase the amount of damages he sought; and (3)
> awarding $2 million in damages for past and future pain and
> suffering, which he contend[ed] [was] lower than comparable awards
> from New York state courts for similar injuries.

*See Malmberg IV*, 816 F.3d at 188.

Defendant cross-appealed from the Court's "refusal to further offset the award for future medical

care to reflect future home health services provided by a third-party contractor paid for by the VA."

*Id.*

The Second Circuit affirmed the Court's "decision not to further offset the award for future

home health services on the ground that the provision of such services going forward is not

reasonably certain." *Id.* at 189. However, it vacated this Court's "decision insofar as it offset the

award for future medical care and supplies [because] [f]ederal law d[id] not require that a veteran

injured as a result of the VA's malpractice be forced to continue under VA care for lack of financial

resources and be subject to a concomitant offset, and New York state law d[id] not require such an

offset." *Id.* at 188-89. In addition, the Second Circuit held that this Court "failed to provide

adequate analysis to support both its denial of [Plaintiff's] motion to amend his ad damnum clause

and its decision to set the award for past and future pain and suffering at $2 million[.]" *Id.* at 189.

Accordingly, the Second Circuit remanded the case with directions that this Court "consider anew

[Plaintiff's] motion to increase the ad damnum, taking into account the testimony of Dr. David

Hunsinger, and determine damages without an offset for future receipt of medical care and supplies from the VA[.]"  *Id.*

## III. DISCUSSION

A.      **Plaintiff's *ad damnum* clause**

Before a plaintiff commences an action under the FTCA in federal court, he must file an administrative claim with the appropriate federal agency specifying the amount of damages he seeks for his claim.  *See O'Rourke v. E. Air Lines, Inc.*, 730 F.2d 842, 855 (2d Cir. 1984), *abrogated on other grounds by Salve Regina Coll. v. Russell*, 499 U.S. 225 (1991) (citation omitted).  Once the plaintiff commences his FTCA action in court, the amount of damages the court may award him generally is limited to the amount he sought in his administrative claim.  *See Lane v. United States*, No. 95CIV.9690, 1996 WL 426312, *2 (S.D.N.Y. July 30, 1996) (citing 28 U.S.C. § 2675(b)).  However, a plaintiff may move to increase the amount of damages he seeks under two circumstances: if the "increased amount is based upon newly discovered evidence not reasonably discoverable at the time of presenting the claim to the federal agency, or upon allegation and proof of intervening facts, relating to the amount of the claim."  28 U.S.C. § 2675(b); *see also Milano v. United States*, 92 F. Supp. 2d 769, 774 (N.D. Ill. 2000) (stating that a "[p]laintiff may seek a larger amount if he meets either of [§ 2675's exceptions]" (citation omitted)).  The plaintiff bears the burden of showing that he satisfies either of the two FTCA exceptions.  *See Tursi v. United States*, No. 13-CV-4756, 2017 WL 3610516, *5 (E.D.N.Y. Aug. 21, 2017) (citation omitted).  "'[W]hether the plaintiff is seeking an increase under the rubric of "newly discovered evidence" or "intervening facts," one of the key issues is foreseeability.'"  *Milano*, 92 F. Supp. 2d at 774 (quoting *Lowry*, 958

F. Supp. at 771).  If, on the one had, "'the condition was reasonably foreseeable at the time [the plaintiff] filed [the claim], an increase will not be allowed.  On the other hand, if it was not . . . [then] an increase may be allowed.'"  *Id.* (quoting *Lowry*, 958 F. Supp. at 771).  "Moreover, in determining whether a plaintiff satisfies one of the two exceptions to the FTCA, the court applies an objective standard."  *Id.* (citing *Michels v. United States*, 31 F.3d 686, 689 (8th Cir. 1994)).

District courts have "'[c]onsiderable discretion . . . to determine what constitutes "newly discovered evidence not reasonably discoverable" at the time the claim was presented, or what is tantamount to "intervening facts, relating to the amount of the claim."'"  *Powers v. United States*, 589 F. Supp. 1084, 1110 (D. Conn. 1984) (quoting *Nichols v. United States*, 147 F. Supp. 6, 9 (E.D. Va. 1957)).  Additionally, "[i]n determining whether the exception is available, [courts] will not [hold plaintiffs] to a standard that charges them with 'knowing what the doctors could not tell [them].'"  *Milano*, 92 F. Supp. 2d at 774 (quoting *Fraysier v. United States*, 766 F.2d 478, 481 (11th Cir. 1985)).  Nonetheless, courts will not permit a plaintiff to increase his *ad damnum* clause solely because he underestimated the original value of his claim.  *See Kielwien v. United States*, 540 F.2d 676, 681 (4th Cir. 1976) (noting that § 2675(b) "'would be meaningless if claimants, after rejection of their claim, could institute actions for amounts in excess of the claim filed merely because they, or their attorneys, are of the opinion that the claim has a greater value'" (quotation omitted)).

Furthermore, "'[d]iagnoses which are merely cumulative and confirmatory of previous diagnoses do not constitute either "newly discovered evidence" or "intervening facts," for purposes of [§ 2675(b)].'"  *Delano v. United States*, No. 08-CV-610C, 2010 WL 3386835, *3 (W.D.N.Y. Aug. 25, 2010) (quoting *Powers v. United States*, 589 F. Supp. 1084, 1110 (D. Conn. 1984)).  Rather, "such evidence must be 'truly unexpected and unforeseen. . . .'"  *Id.* (quoting *Mallard v.*

*Menifee*, 2000 WL 557262, at *6 (S.D.N.Y. May 8, 2000)).

With the aforementioned considerations in mind, "[t]he Second Circuit has held that a motion to increase a [plaintiff's *ad damnum* clause] is usually granted 'only when an unexpected change occurred either in the law or in a medical diagnosis.'" *Tursi*, 2017 WL 3610516, at *6 (quoting *O'Rourke*, 730 F.2d at 856).  Moreover, it has determined that, to meet one of the § 2675(b) exceptions, a plaintiff must show "that 'some new and previously unforeseen information came to light' between the filing of the administrative claim and the trial on damages," and the new information must be "material."  *O'Rourke*, 730 F.2d at 856.  Finally, "[i]n interpreting this exception, the Second Circuit has pointed out that '[t]he FTCA, as a statute waiving sovereign immunity, must be complied with strictly.'"  *McFarlane by McFarlane v. United States*, 684 F. Supp. 780, 782 (E.D.N.Y. 1988) (quoting *O'Rourke v. Eastern Airlines*, 730 F.2d 842, 856 (2d Cir. 1984)).

Plaintiff argues that the Court should grant his post-trial motion to increase his *ad damnum* clause from $6 million to $25 million because Dr. Hunsinger's testimony that Plaintiff's deteriorated condition in 2012 was not "reasonably foreseeable" in 2006 is unrebutted by the trial record, binding on Defendant because Dr. Hunsinger is its employee, and the best evidence of the issue "as it is from the treating physician -- which is entitled to greater credibility and weight than a paid expert witness" and, furthermore, "extensive medical evidence in the case" supports Dr. Hunsinger's opinion. *See* Dkt. No. 162 at 3; Dkt. No. 166.  In particular, Plaintiff argues that "extensive case law" demonstrates that an unforeseen worsening of a known condition, such as what happened in this case, may constitute "newly discovered evidence" or "intervening facts" under § 2675(b) to warrant granting his motion to increase his *ad damnum* clause.  *See* Dkt. No. 162 at 18 (quoting

-6-

*Zurba v. United States*, 318 F.3d 736, 739-740 (7th Cir. 2003)).

In addition to relying on Dr. Hunsinger's opinion, Plaintiff argues that the trial evidence supports Dr. Hunsinger's estimation that Plaintiff's deterioration was not reasonably foreseeable in 2006. *See* Dkt. No. 162 at 15. For example, Plaintiff claims that, when he was discharged in February 2005 following surgery at the VA, he was "independent with all of his activities in daily living" and could walk with a rolling walker. *See id.* at 16. He was also able to go up and down steps with handrails and was "voiding on his own and had spontaneous continent control of stool." *See id.* at 16-17. In contrast, six years later at a doctor's visit at the Bronx VA in 2011, Plaintiff discovered for the first time "that his condition would never allow him to put any weight on his legs, and that he would be confined to a wheelchair for the rest of his life." *See id.* at 17. Plaintiff claims that this discovery caused a "significant increase" in his depression and deterioration in his mental status. *See id.* In addition, Plaintiff notes that, in March 2012, Dr. Hunsinger advised Dr. Reagles, Plaintiff's vocational expert, *see* Dkt. No. 138 at 4, that Plaintiff's condition would deteriorate to the point where he would need around-the-clock medical care by age 62, all of which Plaintiff claims was not reasonably foreseeable when he filed his administrative claim in 2006. *See id.*

Finally, Plaintiff claims that the Court should increase his *ad damnum* clause based on higher damages awards in New York cases involving quadriplegic plaintiffs that were decided after Plaintiff filed his administrative claim in 2006. *See* Dkt. No. 162 at 18. In this regard, Plaintiff notes that, between 2007 and 2011, there were nine cases in which the damages awards were between $10 and $35 million for quadriplegia, which, he argues, meets the "newly discovered evidence" exception under § 2675(b) as it is a "significant, unprecedented, and clearly

unforeseeable development" in the law that justifies the granting of his motion.  *See id.*

### 1. Newly discovered evidence exception

Courts generally apply the "newly discovered evidence" exception "when a plaintiff is unaware of the 'medical extent of his injuries and expenses' at the time his administrative complaint is filed." *Barrett v. United States*, 622 F. Supp. 574, 594 (S.D.N.Y. 1985) (quoting *Powers v. United States*, 589 F. Supp. 1084, 1110 (D. Conn. 1984)) (other citations omitted).  Additionally, some courts have reasoned that "'a known injury can worsen in ways not reasonably discoverable by the claimant or his . . . treating physician, and . . . such "newly discovered evidence" or "intervening facts," if convincingly proved, can warrant § 2675(b) relief.'"  *Milano*, 92 F. Supp. 2d at 775 (quoting [*Michels*, 31 F.3d] at 688) (permitting the plaintiff, who suffered severe injuries to his hip, knee, and ankle but did not factor the cost of future hip surgery into his administrative claim, to seek an amount in excess of his administrative claim because, although "[g]iven his injuries, there was a possibility that he could develop arthritis or necrosis, both of which would require future hip surgery" he "did not show signs of either arthritis or necrosis" when he filed his administrative claim).  However, a treating physician's "subsequent confirmation that the worst possibilities had materialized" will not satisfy this exception where the plaintiff is "on notice of the global extent of [her] injuries and disabilities . . . [and, in fact,] were at the core of [her] administrative claim[.]" *Reilly v. United States*, 863 F.2d 149, 172 (1st Cir. 1988).  The court explained that "[t]he mere fact that these dread consequences, feared from the beginning, had become more certain does not suffice to brand them 'newly discovered.'"  *Id.*  Rather, newly discovered evidence is "evidence that existed when the administrative claim was filed, but was 'not

-8-

discoverable' at that time[.]" *Reynolds v. United States*, No. CIV S-10-161 EFB, 2012 WL 947408, *3 (E.D. Cal. Mar. 20, 2012) (citation omitted).  "Thus, newly discovered evidence is evidence that materially differs from the worst-case prognosis of which the claimant knew or could reasonably have known when he filed the claim, not evidence that merely bears on the precision of the prognosis." *Id.* (citing *Zurba v. United States*, 318 F.3d 736, 741 (7th Cir. 2002)).  "Requiring the plaintiff to guard against a worst-case scenario in preparing his claim gives the Government full notice of its maximum potential liability in the case" and "encourages settlement of FTCA cases in accordance with the statute's purposes." *Lebron v. United States*, 279 F.3d 321, 330-31 (5th Cir. 2002) (citing *Low*, 795 F.2d at 470-71; *Reilly v. United States*, 863 F.2d 149, 172-73 (1st Cir. 1988)).

The Fifth and Eleventh Circuits have also held that a "change in expectation" is sufficient to satisfy § 2675(b)'s "newly discovered evidence" requirement under some circumstances.  *See Fraysier v. United States*, 766 F.2d 478, 480 (11th Cir. 1985) (finding that, under the circumstances of this case, the plaintiff's change in expectation constituted newly discovered evidence within the meaning of § 2675(b) because, although "[t]he physical effect of the injury was apparently about the same at the agency level as it was at trial[,] . . . [t]hat those effects would remain permanent[] was not known at the agency level" and "[p]ermanent injuries obviously warrant more damages than temporary ones"); *Cole v. United States*, 861 F.2d 1261, 1262 (11th Cir. 1988) (*per curiam*) (relying on its holding in *Fraysier* that "a reasonably based change in expectation as to the severity and permanence of an injury is newly discovered evidence within the meaning of section 2675(b)" (citing *Fraysier v. United States*, 766 F.2d 478 (11th Cir. 1985), to support its holding that "the district court could properly award [the plaintiff] $384,000 in damages even though the award

-9-

exceed[ed] the $195,000 he originally sought in his administrative complaint"); *see also United States v. Alexander*, 238 F.2d 314, 318 (5th Cir. 1956) (finding that the plaintiff had satisfied either the "newly discovered evidence" or "intervening facts" exception when, at the time he filed his administrative claim, the plaintiff had no "knowledge . . . that his shoulder would not heal without surgery and [it would have been] impossib[le] [for him to] acquir[e] such knowledge at the time of presenting the claim").

On the other hand, in *Lowry v. United States*, Civ. A. No. 91-11233-WF, 1992 WL 164481 (D. Mass. July 1, 1992), the district court found that the plaintiff had failed to meet the "newly discovered evidence" exception under § 2675(b). *See id.* at *5. In that case, the plaintiff asserted that "the diagnosis of her low back disc herniation and the establishment of the permanent nature of her disability after the filing of her administrative claim constitute[d] 'newly discovered evidence'" to justify increasing her *ad damnum* clause. *Id.* at *3. The court rejected this argument, finding that "this information [was] . . . neither new nor unforeseen" because the plaintiff's doctor's reports during the course of her treatment "were clearly a harbinger of the potential end results" of her illness, including the lower back disc herniation and her total disability. *Id.* The court noted, for example, that in his first report, the plaintiff's physician had noted that the plaintiff was experiencing back pain; and, in his second report, he described her lower back pain as "chronic." *Id.* Thus, the court concluded that the fact that the plaintiff "did not know the exact cause of her low back pain, or the true extent of her injury[] . . . d[id] not make the ultimate diagnosis unforeseeable." *Id.* (citation omitted). In addition, the court found that the plaintiff "unquestionably also knew that she was  disabled even though her doctor had "originally opined that it was likely that [plaintiff] would be able to return to work in an administrative capacity in

-10-

three to six months" because "eight months later [the doctor's] opinion was much less optimistic." *Id.* at *4. Specifically, the court found that the doctor's second report "foreshadowed" the plaintiff's final diagnosis of permanent disability when he stated that she would only be able to return "to some occupation which [did] not involve heaving lifting." *Id.* at *3. As such, the court concluded that "[t]he handwriting of the potential worst case scenario was on the wall by [the time the plaintiff filed her administrative claim]." *Id.* at *4 (noting that, "[i]n accord with the Fifth Circuit, the First Circuit has held 'the fact that the degree of disability was uncertain was, in and of itself, inadequate to trigger the exception to § 2675(b).'" (quoting *Reilly v. United States*, 863 F.2d at 172-173)).

At the trial in December 2012, when Plaintiff's counsel asked Dr. Hunsinger whether, in 2006 "as far as [he] was concerned, [it was] reasonably foreseeable that you would be able to predict the deterioration that [Plaintiff] has today in his medical status?," he responded, "No." *See* Dkt. No. 138 ("Trial Tr.") at 81:21-82:2. Plaintiff's counsel then asked Dr. Hunsinger if he could tell the Court "what is the benefit of the passage of time in being able to, . . ., come to opinions with respect to [Plaintiff's] future needs?", to which Dr. Hunsinger responded, "We now have some history of how [Plaintiff has] progressed since the surgery that allows us to better project what his future condition might be." *See id.* at 82:3-11.

The Court cannot simply accept Dr. Hunsinger's trial testimony as the definitive answer to the question of whether the extent to which Plaintiff's condition would deteriorate was reasonably foreseeable in 2006. As Defendant correctly points out, the relevant question under the law is whether the extent to which Plaintiff's condition would deteriorate was *objectively* not reasonably foreseeable at the time he filed his administrative claim in light of *all* the evidence before the Court, not whether in Dr. Hunsinger's opinion, albeit an important one given his status as Plaintiff's

-11-

treating physician, that the extent to which Plaintiff's would deteriorate was not reasonably foreseeable.  Furthermore, it is not as clear as Plaintiff suggests that Dr. Hunsinger's testimony is "unrebutted" by the record.  Rather, Dr. Hunsinger's letters and his deposition testimony appear to suggest that Plaintiff's severe deterioration was foreseeable at the time he filed his administrative claim.

Although the worst case outcome of Plaintiff's injuries revealed itself only with the passage of time, the record indicates that "[t]he handwriting of the potential worst case scenario [of Plaintiff's injury] was on the wall" at the time Plaintiff filed his administrative claim in January 2006.  *Lowry*, 1992 WL 164481, at *4.  As previously mentioned, after the surgery in November 2004, Plaintiff was diagnosed with "C7 incomplete quadriplegia, neurogenic bladder and bowel." *Malmberg III*, at *1 (citing Dkt. No. 143 at ¶ 10).  Furthermore, when Plaintiff filed his administrative claim in January 2016, he indicated that he was left with "paralysis involving all extremities."  *See* Dkt. No. 115-1 ("Administrative Claim").  Plaintiff's claim of paralysis in January 2006 is consistent with Dr. Hunsinger's June 2006 letter, in which he stated that Plaintiff's mobility was "significantly impaired by his quadriplegia" and that he suffered from "depression [as] a direct result of his quadriplegia."  *See* Dkt. No. 161-4 at 2.  He also characterized Plaintiff as "permanently completely disabled and unemployable."  *See id.*

Likewise, in a letter that Dr. Hunsinger wrote in December 2006, he once again reiterated that Plaintiff had "limited use of his legs" and had begun to develop "increasing episodes of [rhythmic vibratory movements] in his legs."  *See* Dkt. No. 161-5 at 3.  Moreover, Dr. Hunsinger stated that Plaintiff "note[d] that he [was] in chronic pain."   Dr. Hunsinger wrote that, [a]s a result of [Plaintiff's] disabilities, he suffers from "chronic depression."  *See id.*  Lastly, he indicated that

-12-

Plaintiff "aniticipat[ed] the need for a handicapped accessible van" and that his home needed to be modified to "accommodate a scooter, walker, and wheelchair." *See id.* Finally, when asked at his March 2012 deposition whether a continued decline in Plaintiff's overall condition could be expected, Dr. Hunsinger answered, "[W]ith patients with a . . . severe disability, like [Plaintiff], . . ., that's more the expectation rather than improvement." *See* Dkt. No 110-2 ("Transcript of March 23, 2012 Videotaped Deposition of Dr. Hunsinger") at 12:11-13.

Much like the doctor's reports during the course of the plaintiff's treatment in *Lowry* "foreshadowed" her low back disc herniation and status as permanently disabled, so, too, in this case, the record evidence indicates that, at the time that he filed in administrative claim, Plaintiff certainly was on notice of the potential for significant and severe deterioration in his condition. Therefore, the Court concludes that Plaintiff's realization in 2011 that "he would be confined to a wheelchair" and Dr. Hunsinger's prediction in 2012 that Plaintiff would need "around-the-clock care by age 62" were reasonably foreseeable when Plaintiff filed his administrative claim. The same is true with regard to Plaintiff's mental state. Although he claims that his depression "significantly increased" in 2011, Dr. Hunsinger described Plaintiff's depression as ongoing and chronic as early as 2006.

Moreover, Plaintiff has not convincingly demonstrated that his injuries have worsened in ways that neither he nor his physician could have reasonably discovered prior to the filing of his administrative claim. As noted, Plaintiff was diagnosed after his surgery with "C7 incomplete quadriplegia" and stated in his administrative claim that he had paralysis in all of his extremities. In addition, Plaintiff had begun to evidence signs of deterioration and complete paralysis as early as 2006. Furthermore, the evidence does not support a conclusion that "expectations changed"

regarding Plaintiff's prognosis. As already noted, at his 2012 deposition, Dr. Hunsinger responded to Plaintiff's counsel's question about whether a continued decline in Plaintiff's overall condition was more the expectation than that his condition would improvement, Dr. Hunsinger answered, "That would be correct." *See* Dkt. No. 110-2 at 12:3-15. Dr. Hunsinger's response makes clear that, prior to the time that Plaintiff filed his administrative claim, both Dr. Hunsinger and Plaintiff expected that Plaintiff's condition would continue to deteriorate over time.

Accordingly, for all these reasons, the Court concludes, as it did in 2012, that Plaintiff's "injuries . . . and the wors[t] case scenario attendant to such injuries were known or reasonably discoverable at the time that Plaintiff filed his administrative complaint." *Malmberg v. United States ("Malmberg II")*, No. 5:06-CV-1042, 2012 WL 4953091, *6 (N.D.N.Y. Oct. 15, 2012). Furthermore, the Court finds that Plaintiff has failed to demonstrate that evidence in the record, including Dr. Hunsinger's trial testimony, constitutes "newly discovered evidence" sufficient to warrant granting his motion to increase his *ad damnum* clause.

### 2. "Intervening facts" exception

Section 2675(b)'s "intervening facts" exception "concern[s] information or events arising after the filing of the claim." *Reynolds*, 2012 WL 947408, at *3 (citing *Lowry v. United States*, 958 F. Supp. 704, 710 (D. Mass. 1997)). An unexpected change in the law can constitute an "intervening fact" under § 2675(b). *See O'Rourke*, 730 F.2d at 856 (discussing *Funston v. United States*, 513 F. Supp. 1000, 1007 (M.D. Pa. 1981), in which the district court held that "the unpredicted adoption by the state supreme court of a new method of discounting the present value of lost future earnings constituted an intervening fact" and "granted plaintiff's motion to increase the

-14-

*ad damnum* clause, 'but only to the extent that the increase is applicable to the fact that in submitting the administrative claim Plaintiff discounted his request for lost future earnings as required by then applicable law" (quoting [*Funston*, 513 F. Supp.] at 1007)) (other citations omitted).  Additionally, courts strictly interpret the term "'intervening fact' . . . to require that it be unexpected or unforeseen." *Allgeier v. United States*, 909 F.2d 869, 877 (6th Cir. 1990) (citations omitted); *see also McMichael v. United States*, 856 F.2d 1026, 1035-36 (8th Cir. 1988) (concluding that the district court did not err in allowing the plaintiffs to amend their complaints to increase the amount of damages they sought "in the unique circumstances of this case," where the depreciation of the value of a dollar by about 50% over a ten year period was an unforeseeable "intervening fact" based on financial expert affidavits and the fact that the plaintiffs did not know and could not have known at the time they filed their administrative claims that their case "would remain unresolved for over ten years").

In *Funston*, the court granted the plaintiff's motion to increase his *ad damnum* clause following the Supreme Court of Pennsylvania's decision in *Kaczkowski v. Bolubsz*, 491 Pa. 561, 421 A.D.2d 1027 (1980).  *See Funston v. United States*, 513 F. Supp. 1000, 1007 (M.D. Pa. 1981).  In that case, the plaintiff argued that the decision in *Kaczkowski* "constitute[d] an intervening fact relating to the amount of the claim." *Funston*, 513 F. Supp. at 1007.  The court agreed, noting that, in *Kaczkowski*, the Supreme Court of Pennsylvania had "held that in the future a plaintiff would be entitled to a recovery for lost future earning potential that included the effects of inflation" and that, "[a]s a result, once the damage for lost future earnings [was] calculated, it would not be discounted." *Id.*  In the *Funston* court's view "[t]he Pennsylvania Supreme Court's decision [was] . . . . a fact relating to the amount of the claim[.]" *Id.*  Therefore, the court concluded that "the Plaintiff

-15-

[was] entitled to seek an amount in excess of his administrative claim but only to the extent that the increase [was] applicable to the fact that in submitting the administrative claim Plaintiff [had] discounted his request for lost future earnings as required by then applicable law." *Id.*

Several months after the Middle District of Pennsylvania issued its decision in *Funston*, the Eastern District of Pennsylvania reached the same result in *Gallimore v. United States*, 530 F. Supp. 136 (E.D. Pa. 1982). In that case, the court granted the plaintiff's motion to increase her *ad damnum* clause after determining that the decision in *Kaczkowski* constituted "an intervening event that justifie[d] amendment under section 2675(b) . . . ." *Id.* at 138. The court explained that, although "[t]he change in Pennsylvania law concerning the measurement of damages for future loss of earnings brought about by the "Pennsylvania Supreme Court's decision . . . clearly has a significant impact on the amount of damages that plaintiff is entitled to claim[,][1] [a]dmittedly, such a change does not, on its face, appear to be an 'intervening fact[.]'" *Id.* Nonetheless, because the court was required to "look to Pennsylvania law for the measure of damages and since it would have been impossible to predict this change in longstanding Pennsylvania precedent at the time plaintiff filed her administrative claim, it seems reasonable to view this change as an intervening event that justifies amendment under section 2675(b) . . . ." *Id.* Moreover, the court found that, because the "plaintiff [did] not assert that this change in the law provide[d] a new theory of liability or [gave] rise to a new cause of action, the Government was fully aware of the specifics of plaintiff's claims at the time it reviewed plaintiff's administrative file." *Id.* at 138. Therefore, "[t]he

---

[1] Following the Pennsylvania Supreme Court's decision, a plaintiff could "calculate damages for loss of future earnings without discounting to present value[.]" *Gallimore*, 530 F. Supp. at 137. The court noted that "the obvious consequence of this change [was] to increase the amount of damages a plaintiff [might] claim." *Id.*

Government's ability to evaluate the merits of the underlying claim for settlement purposes or to prepare an adequate defense [was] not prejudiced by such an amendment since it [did] not involve a new theory of liability or new set of facts that [had to] be rebutted." *Id.* at 139. For these reasons, the court granted the plaintiff's motion to amend her *ad damnum* clause. *See id.*

In this case, Plaintiff contends that in nine New York cases, which were decided after he filed his administrative claim, the courts granted larger damages awards for injuries similar to his and that, therefore, those cases constitute an "intervening fact" to justify increasing his *ad damnum* clause.[2] However, unlike the situation in *Gallimore* and *Funston*, in which the courts allowed the plaintiffs to increase their *ad damnum* clauses because a decision of the Supreme Court of Pennsylvania had changed the **methods** for calculating damages awards, in this case, no decision of the New York Court of Appeals has altered the methods of calculating damages awards. Rather, the cases on which Plaintiff relies simply involve damages awards greater than those that Plaintiff received, which, given that those cases were decided **after** Plaintiff filed his administrative claim, cannot be considered unusual or unexpected. Moreover, in the cases Plaintiff cites, the courts

---

[2] To support his argument, Plaintiff cites the following nine cases: (1) *Saladino v. Stewart & Stevenson Servs., Inc.*, No. 01-CV-7644, 2011 WL 284476, *3 (E.D.N.Y. Jan. 26, 2011), *aff'd sub nom. Saladino v. Am. Airlines, Inc.* 500 F. App'x 69 (2d Cir. 2012) (summary order) (finding that a $15 million dollar award did not deviate materially from reasonable compensation); (2) *Barnhard v. Cybex Int'l, Inc.*, 864 N.Y.S.2d 378 (4th Dep't 2008) (awarding $3 million for past pain and suffering and $9 million for future pain and suffering); (3) *McMillan v. City of N.Y.*, Nos. 03-CV-6409, 08-CV-2887, 2008 WL 4287573, *8 (E.D.N.Y. Sept. 9, 2008) (awarding $4.5 million for past pain and suffering and $7.5 million for future pain and suffering); (4) *Savillo*, 2011 N.Y. Slip Op 31950(U) (awarding $10 million for past pain and suffering and $25 million for future pain and suffering); (5) *Miraglia v. H & L Holding Corp.*, 36 A.D.3d 456, 457-58 (1st Dep't 2007) (awarding $10 million); (6) *Bissell v. Town of Amherst*, 56 A.D.3d 1144, 1148 (4th Dep't 2008) (awarding $10 million); (7) *Okraynets v. Metro. Transp. Auth.*, 555 F. Supp. 2d 420, 437 (S.D.N.Y. 2008) (awarding $10.5 million); (8) *Tenuto v. Lederle Labs.*, No. 1134/81, 2010 WL 625223, *2, *21 (N.Y. Sup. Ct. 2010) (awarding $17.5 million); and (9) *Aquilar v. N.Y. Transit Auth.*, 81 A.D.3d 509, 509-10 (1st Dep't 2011) (awarding $10 million).

considered the same factors that courts have long considered, *e.g.*, the age and life expectancy of the plaintiff, the extent and severity of the injuries, the degree of pain, and whether the injuries were permanent, in determining what a reasonable damages award would be under all of the circumstances.

In addition, the higher awards in these nine cases do not satisfy the "strict" requirement that "intervening facts" be "unexpected or unforeseen."  Unlike the plaintiff in *McMichael*, for example, Plaintiff has not proffered any evidence, such as a sworn affidavit or expert testimony, that would support a finding that an increase in damages awards in cases that the courts decided after Plaintiff filed his administrative complaint was "unforeseeable."  Similarly, in *Gallimore* and *Funston*, the courts relied on concrete changes in the law that directly affected the value of the plaintiffs' awards. To the contrary, in this case, Plaintiff has not provided any support for his argument that an upward trend in damages awards affected the value of his award in the same way that a dramatic and unprecedented change in inflation rates over a ten year period or the method by which courts calculate an award of damages would.

Accordingly, for all these reasons, the Court **denies** Plaintiff's motion to amend his *ad damnum* clause.

**B.    Plaintiff's award for past and future pain and suffering**

Since the Court has denied Plaintiff's motion to amend his *ad damnum* clause, the total amount of damages Plaintiff can recover in this action is limited to $6 million, the amount he demanded in his administrative claim and complaint.  This amount includes both economic damages and damages for pain and suffering.

-18-

The Court initially awarded Plaintiff damages of $4,468,859.91, which included an award for future economic damages in the amount of $2,468,859.91 and an award for past and future pain and suffering in the amount of $2,000,000.  *See Malmberg III* at *16.  However, in light of the Second Circuit's mandate, both parties agree that Plaintiff's award for future economic needs should total $3,488,680.  *See* Dkt. No. 161 at 15-16; Dkt. No. 164 at 25.  Thus, when added to the $500,000 award for past pain and suffering and the $1.5 million award for future pain and suffering, the total damages award is **$5,488,680.**[3]

## C.      Calculation of the amended judgment on remand

In its mandate, the Second Circuit instructed this Court to correct "certain mathematical errors" that both parties identified in this Court's final damages award.  *Malmberg*, 816 F.3d at 196.  However, because the Second Circuit also held that Defendant was not entitled to an offset for the future medical services that the VA could provide for free, which is where these mathematical errors occurred, this issue is no longer relevant.  *See* Dkt. No. 161 at 15.

However, Defendant asserts that, in fashioning the judgment, the Court should amend the offset for § 1151 benefits, which was not challenged on appeal, to include the benefits received through the date of judgment.  *See* Dkt. No. 161 at 15-16.  That is, the original award included an offset for benefits received through August 2014.  *See id.* at 16.  However, the new award must

---

[3] Since the Court has denied Plaintiff's motion to increase his *ad damnum* clause above the $6 million that he sought in his administrative claim, there is no reason for the Court to address how the $2.5 million award for past and future pain and suffering compares to awards in cases involving plaintiffs with comparable injuries because, even if the Court were to find that comparable cases warranted an increase, any such increase would be limited to a mazimum of $511,320 ($6 million - $5,488,680).

include an offset for monthly benefits of $7,131 up to the date of the award. *See id.* Therefore, Defendant asserts that the total offset would be $667,857. *See id.*

In sum, Defendant argues that the Court should take the present value of the Reagles Scenario #2 ($4,156,537) and deduct from that amount the § 1151 benefits received as of the date of the judgment in August 2016 ($667,857). *See id.* Plaintiff agrees. *See* Dkt. No. 164 at 25. This would result in a net award for future economic damages in the amount of $3,488,680. Accordingly, when the $2 million award for past pain and suffering is added to this amount, Plaintiff's total damages award would amount to **$5,488,680**, as set forth below.

| | |
|---|---|
| (1) Present value of Reagles Scenario #2 | $ 4,156,537 |
| (2) Minus § 1151 benefits until August 2016 | $  (667,857) |
| (3) Past pain and suffering | $   500,000 |
| (4) Future pain and suffering | $ 1,500,000 |
| Total | **$5,488,680** |

## D.    Creation of a reversionary trust

### 1. Timeliness of Defendant's request

In suits brought under the FTCA, "state substantive law applies; however, the Federal Rules of Civil Procedure . . . govern 'the manner and time in which defenses are raised and when waiver occurs.'" *Lee v. United States*, 765 F.3d 521, 523 (5th Cir. 2014) (quoting *Simon v. United States*, 891 F.2d 114, 1156 (5th Cir. 1990)).  Rule 8(c) requires that parties "'affirmatively state any avoidance or affirmative defense' in their responsive pleadings." *Id.* (quoting FRCP 8(c)(1)). Whether a periodic payment statute constitutes an affirmative defense under Rule 8(c) is a question of state substantive law. *See id.* "Generally, failure to comply with FRCP 8(c) results in a waiver of the . . . affirmative defense." *Id.* at 523-24 (citing *Simon*, 891 F.2d at 1157); *Vanhoy v. United*

*States*, 514 F.3d 447, 450 (5th Cir. 2008).  However, if a defendant "'raises the issue at a "pragmatically sufficient time," and if the plaintiff is not prejudiced in its ability to respond, there is no waiver of the defense.'"  *Vanhoy*, 514 F.3d at 450 (quotation omitted).  A plaintiff is prejudiced if he did not have sufficient notice to "prepare for and contest the defense[.]"  *Rogers v. McDorman*, 521 F.3d 381, 387 (5th Cir. 2008).

In *Vanhoy*, the Fifth Circuit refrained from deciding whether the government's request to apply the state periodic payment scheme was an affirmative defense because, even assuming that it was, the court found that the government had not waived the defense because it had raised it at a "pragmatically sufficient time," having discussed the applicability of the periodic payment statute "on multiple occasions prior to trial," which provided the plaintiffs with plenty of time to respond. *See Vanhoy*, 514 F.3d at 451; *see also Lee*, 765 F.3d at 524-25 (same).

Likewise, in this case, even if the Court assumes that the creation of a reversionary trust in light of New York's periodic payment statute constitutes an affirmative defense, the Court concludes that Defendant has raised the issue at a "pragmatically sufficient time" and that Plaintiff has not been prejudiced by the timing of this request.

As to the timing of the request, although it is true, as Plaintiff points out, that Defendant knew of the large future damages award and the state's periodic payment statute as early as 2012, there was no need for Defendant to raise the issue at that time because the Court had offset an amount for future medical benefits that the VA could provide for free; and, thus, Defendant was not concerned that it would have to pay twice for the same injury.  However, once the Second Circuit determined that the offset was inappropriate, Defendant became concerned about a windfall to Plaintiff and thus raised the issue of the creation of a reversionary trust.  In addition, there is no

-21-

prejudice to Plaintiff as he has had sufficient notice and time to contest Defendant's request for the creation of a reversionary trust. *See* Dkt. Nos. 164, 166. Therefore, the Court finds that Defendant's request for the creation of a reversionary trust is timely.

### 2. Merits of Defendant's request for the creation of a reversionary trust

Defendant requests that the Court direct that it place the future economic damages portion of the award in a reversionary trust, with any unused portion reverting to Defendant upon Plaintiff's death. *See* Dkt. No. 161 at 4. To support this request, Defendant argues that, because the FTCA has waived Defendant's sovereign immunity only insofar as it is held liable "'to the same extent as a private individual under like circumstances', where the state law that governs an FTCA case has a periodic payment of judgment statute like New York's, the district court should approximate a remedy by the imposition of a reversionary trust[.]" *See* Dkt. No. 165 at 2.

Alternatively, Defendant asserts that the Court has the "inherent authority" to direct that the costs of future medical care be paid into a reversionary trust to avoid a double recovery windfall to Plaintiff. *See* Dkt. No. 161 at 6; Dkt. No. 165 at 2. In other words, Defendant claims that "where portions of a future damages award represent[] the cost of care that may be provided by the government at no cost, district courts have the authority to award damages in the form of a reversionary trust to pay only for medical care or needs sought from non-governmental providers or facilities." *See* Dkt. No. 165 at 2 (citing *Deasy v. United States*, 99 F.3d 354, 359-60 (10th Cir. 1996)). This is necessary, according to Defendant, to "avoid the risk that the government will pay twice for the same injury." *See* Dkt. No. 161 at 7. Thus, Defendant asserts that, because "the Second Circuit has concluded that an offset for [the value of medical care, supplies and goods, and

-22-

home health care services that the VA may provide for free] is not appropriate, . . .this Court may simply order that those portions of the judgment be paid (in a lump sum by the government) into a reversionary trust." *See* Dkt. No. 165 at 3.  Finally, Defendant asserts that a reversionary trust would achieve justice and adequately balance the competing interests that the Second Circuit discussed: "Plaintiff may choose to receive care, supplies, and goods from any provider he wishes, and the costs will be paid out of the trust[; b]ut if he chooses to continue to receive such items from the government at no cost, the government will not have to both pay the costs and provide the services free of charge." *See id.*

In response, Plaintiff argues that the creation of a reversionary trust would impermissibly violate the FTCA's requirement of lump-sum money judgments.  *See* Dkt. No. 164 at 6. Furthermore, Plaintiff claims that a reversionary trust does not replicate Article 50 of New York Practice Law and Rules because § 5031 requires that the court conduct a "variety of calculations" and that the defendant must "pay out 35% of the present value of future economic damages as a lump sum," *see id.*, whereas Defendant's proposal requires placing the "entire award for future medical expenses . . . in a trust without taking into consideration any lump sum to [Plaintiff] or attorneys' fees and litigation expenses as required under the CPLR," *see id.* at 14-15.  Therefore, Plaintiff claims that "[i]t is obvious that what Defendant is really doing is delaying its payments even further with the hope that [Plaintiff] will die in the interim so it can escape its [monetary] obligation[.]"  *See id.* at 15.  Finally, Plaintiff asserts that "Defendant's discussion of a reversionary trust fails to get into any of the details of what it proposes or is required by CPLR 5031(g)(2)" and asserts that § 5031(g)(2) "envisions that the payments for future medical expenses shall continue to run for the entire life of the plaintiff increasing each year beyond the period of years determined by

the finder of fact at the growth rate as determined by the finder of fact." *See id.*

The FTCA "authorizes private tort actions against the United States 'under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.'" *United States v. Olson*, 546 U.S. 43, 44 (2005) (quoting 28 U.S.C. § 1346(b)(1)).  The key, however, is that the government only waives its sovereign immunity from torts suits provided that it is liable "'in the same manner and to the same extent as a private individual under the circumstances[.]'" *Molzof v. United States*, 502 U.S. 301, 305 (1992) (quoting 28 U.S.C. § 2674).  State substantive law of the state where the tortious act occurred governs the government's liability and damages awards.  *See Yan Zhao v. United States*, 1:06-CV-00106 EAW, 2017 WL 3332245, *17 (W.D.N.Y. Aug. 4, 2017); *Liranzo v. United States*, 690 F.3d 78, 86 (2d Cir. 2012) (stating that "the FTCA directs courts to consult state law to determine whether the government is liable for the torts of its employees" (citations omitted)).

Since Plaintiff's injuries occurred in New York, New York law governs the appropriate damages award in this action.  *See Estevez v. United States*, 74 F. Supp. 2d 305, 307 (S.D.N.Y. 1999); *Malmberg III*, at *1.  The New York statutory provision that governs future economic damages awards in medical malpractice actions requires a liable party to pay future economic and pecuniary damages awards in a manner that includes both a lump sum payment and periodic payments thereafter.  *See* N.Y. C.P.L.R. § 5031(d).

As the court stated in *Ferrarelli v. United States*, No. CV 90-4478 JMA, 1992 WL 893461 (E.D.N.Y. Sept. 24, 1992), "[a]t the common law, courts were powerless to enter money judgments in any manner other than a lump sum . . . [and] [f]or that reason federal jurists have consistently recognized that their judgments may not take a contrary form 'unless and until Congress shall

-24-

authorize a different type of award[.]'"  *Id.* at *18 (quoting *Frankel,* 466 F.2d at 1229); (citing *Reilly*, 863 F.2d at 169-70; *Andrulonis*, 724 F. Supp. at 1421 n.616).  Furthermore, although several circuits have permitted the government to make non-lump-sum payments, including periodic payments from a reversionary trust, under certain circumstances[,] *see, e.g., Askew v. United States*, 786 F.3d 1091, 1093 (8th Cir. 2015) (applying Missouri law); *Dutra v. United States*, 478 F.3d 1090, 1092 (9th Cir. 2007) (applying Washington law), the Second Circuit has not addressed this issue; and lower courts in the Second Circuit are divided as to whether courts must enter FTCA judgments entirely in a lump sum.  *Compare Estevez*, 74 F. Supp. 2d at 307 (holding that the court had discretion to structure damages awards because New York CPLR § 5041, which "extend[ed] the structured judgment requirement to tort actions generally, including: personal injury, injury to property, and wrongful death" "require[d] structured payouts when future damages exceed[ed] $250,000") *with Ferrarelli*, 1992 WL 893461, at *18 (requiring the government to pay the future damages award in a lump sum because "[t]he government [did] not direct[] the Court to any authority for applying CPLR's structured judgment provisions in a case brought under the FTCA, nor [did] the Court locate any"); *Andrulonis v. United States*, 724 F. Supp. 1421, 1519 n.616 (N.D.N.Y. 1989) (stating that "the FTCA contemplates a lump-sum award, and this court lacks the power to enter judgment in this case 'in terms other than a simple award of money damages' and thus cannot mandate the purchase of an annuity or otherwise structure its award" (citations and quotations omitted)).

The Fourth, Fifth, Eighth, and Ninth Circuits have affirmed district court decisions ordering the government to provide periodic payments in the form of a reversionary trust where applicable state law requires or allows for periodic payments of future economic damages in tort actions.  In

*Dutra*, for example, the Ninth Circuit concluded that "the FTCA requires the district court to apply Washington law[, under which], in certain personal injury actions for future economic damages, 'the court . . . *shall*, at the request of a party, enter a judgment which provides for the periodic payment of the future economic damages.'" *Dutra*, 478 F.3d at 1092.  In so finding, the court rejected the plaintiff's argument that the Washington statute was "incompatible with federal law because the FTCA prohibits the United States from making periodic payments." *Id.*  To the contrary, the court stated that "[t]he FTCA authorizes courts to craft remedies that approximate the results contemplated by state statutes, and nothing in the FTCA prevents district courts from ordering the United States to provide periodic payments in the form of a reversionary trust." *Id.* (citations omitted); *see also Askew*, 786 F.3d at 1093-94 (finding that the district court should have ordered the creation of a reversionary trust to "best approximate the results contemplated by the Missouri [periodic payment] statutes" and rejecting the district court's explanation that it did not do so because it was not in the plaintiff's "best interest"); *Lee*, 765 F.3d at 527 (holding that, "although the district court could not impose a continuing obligation on the government," it nevertheless "erred by not applying the Texas statutory scheme" that permitted periodic payments); *Cibula v. United States*, 551 F.3d 316, 322 (4th Cir. 2009) (remanding the case so that the district court could "make findings to determine whether the creation of a reversionary trust would, if properly structured, impose liability on the government in the same manner and to the same extent as a private individual" under California's periodic payment statute)

Other circuits have permitted district courts to establish reversionary trusts even in the absence of state law requiring courts to structure certain damages in the form of periodic payments that would cease upon the plaintiff's death.  *See Hull v. United States*, 971 F.2d 1499 (10th Cir.

-26-

1992).  In *Hull*, the Tenth Circuit held that "the district court ha[d] the inherent authority to order that [the plaintiff's] damages be paid in the form of a fully reversionary trust if it concludes that is in [the plaintiff's] best interest, so long as the government's obligation to [the plaintiff] ceases when it pays a fixed lump sum to fund that trust."  *Id.* at 1505.  In so finding, the Tenth Circuit noted as "highly relevant" the fact that the plaintiff fully consented to a reversionary trust.  *See id.*  In addition, in determining whether such a trust is appropriate, the Tenth Circuit advised that district courts should *only* consider "what form or structure of damages best serves [the plaintiff's] interests from [the plaintiff's] perspective only."  *Id.*  Therefore, courts "should not consider whether either the government or the [plaintiff's] parents assume a risk or whether either might receive a 'windfall' upon [the plaintiff's] untimely death because of the presence or absence of a reverter" because "[t]he award is to compensate [the plaintiff], and [the plaintiff] only [and, therefore] the possibility that the [plaintiff's] parents might succeed to [plaintiff's] award is not relevant."  *Id.  But see Deasy v. United States*, 99 F.3d 354, 360 (10th Cir. 1996) (finding that the district court did not err in awarding damages in the form of a reversionary trust in part because it "ensures that [the] plaintiff does not receive a windfall").

On the other hand, as noted, there are circuits that have prohibited the creation of a reversionary trust in FTCA cases.  For example, in *Reilly*, the First Circuit held that "the court below was right in insisting that its award be rendered in lump-sum form."  *Reilly*, 863 F.2d at 170 (footnote omitted).  However, the court noted that periodic damages awards would be permissible in lieu of a lump sum payment under "unusual circumstances" not present in that case, such as in the instance that a "controlling [periodic payment] statute permit[ted] [it]"; "by agreement of the parties in interest"; or "where a trust, annuity, or other prophylactic arrangement is necessary to

-27-

ensure that the injured party will in fact receive his due[.]"  *Id.* at 169 n.16 (citations omitted).

Similarly, the Third Circuit in *Frankel v. Heym*, 466 F.2d 1226 (3d Cir. 1972), stated that, "in administering the [FTCA,] a district court should not make other than lump-sum money judgments unless and until Congress shall authorize a different type of award."  *Id.* at 1228-29. This rule, the Third Circuit found, was justified for two reasons: (1) the waiver of sovereign immunity under the FTCA incorporates the common law principle that awards in civil suits must take the form of common law money judgments and (2) lump sum money judgments are preferable because they do not impose a "continuing burden of judicial supervision" that attends a judgment creating a trust.  *Id.* at 1229.  *But see Late v. United States*, Civil No. 1:13-CV-0756, 2015 WL 914895, *3-*4, *6 (M.D. Pa. Mar. 3, 2015) (distinguishing *Frankel* because that decision "preceded Pennsylvania's passage of the [Medical Care Availability and Reduction of Error Act ("MCARE Act")] and, therefore, there was no authority mandating that the award be structured as the United States requested"[;] . . . however, the MCARE Act mandates that future medical expenses must be paid periodically in Pennsylvania . . . [and] [t]hus, *Frankel*'s holding is at odds with the FTCA's requirement that the United States be treated like a private defendant under the law of the state where the tort occurred").

In this case, New York's applicable statute for the payment of future economic damages, *see* N.Y. C.P.L.R. § 5031(d), is a mixed lump sum/periodic payment statute.  Section 5031(d) provides as follows:

> The findings of future economic and pecuniary damages except in wrongful death actions, shall be used to determine a stream of payments for each such item of damages by applying (i) the growth rate, to the (ii) annual amount of current dollars, for the (iii) period of years, all of such items as determined by the finder of fact for each such item of damages.  The court shall determine the present value of

the stream of payments for each such item of damages by applying a discount rate to the stream of payments.  **After determining the present value of the stream of payments for future economic and pecuniary damages, thirty-five percent of that present value shall be paid in a lump sum, and the stream of payments for future economic and pecuniary damages shall be adjusted accordingly by proportionately reducing each item of the remaining stream of payments for future economic and pecuniary damages and paying those amounts over time in the form of an annuity** in accordance with the provisions set forth in subdivision (g) of this section, subject to the adjustments and deductions specified in subdivision (f) of this section.

N.Y. C.P.L.R. § 5031(d) (emphasis added).

Thus, a tortfeasor must pay 35% of the future damages award in a lump sum and the remainder of the award in the form of a fixed sum each year from the date of the verdict for either a "period of years determined by [the Court]" or "the life of the plaintiff, whichever is shorter[.]" N.Y. C.P.L.R. § 5031(d), (g).[4]  In addition, § 5031(g) requires that "[t]he defendant[] and [its]

---

[4] In addition § 5031(f)(2) requires that the court

deduct the litigation expenses of the plaintiff's attorney proportionately from each remaining item of the damages awards, including the remaining lump sum payments specified in subdivisions (b), (c), and (d), and the present value of the remaining streams of payments specified in such subdivisions (c) and (d), and such expenses shall be paid in a lump sum.  After said deductions, the streams of payments specified in such subdivisions (c) and (d) and their present value shall be adjusted accordingly.

N.Y. C.P.L.R. § 5031(f)(2).

Furthermore, § 5031(f)(3) requires that

[t]he court shall then determine the attorney's fees based upon the remaining damages awards, including the remaining lump sum payments specified in such subdivisions (b), (c), and (d), and the present value of the remaining streams of payments specified in

(continued...)

-29-

insurance carrier[] shall be required to offer and to guarantee the purchase and payment of an

annuity contract to make **annual payments in equal monthly installments** of the remaining

streams of payments specified in such subdivisions (c) and (d), after making the deductions and

adjustments prescribed in subdivision (f) of this section." N.Y. C.P.L.R. § 5031(g) (emphasis

added). Furthermore, this section requires that

> [t]he annuity contract shall provide that the payments shall run from
> the date of the verdict (unless some other date is specified in the
> verdict) for the period of years determined by the finder of fact
> (except the stream of payments for future pain and suffering, which
> shall not exceed eight years) or the life of the plaintiff, whichever is
> shorter, except that: . . . (2) awards for any type of economic or
> pecuniary damages as to which the finder of fact found that the loss
> or type of damages is permanent, the payments for that item shall
> continue to run for the entire life of the plaintiff, increasing each year
> beyond the period of years determined by the finder of fact at the
> same growth rate as determined by the finder of fact.

*Id.*

Defendant has not explained how placing the future economic damages award into a

reversionary trust would achieve its goal of preventing a windfall to Plaintiff in the event he wishes

to receive free medical care from the VA. That is, under § 5031, Plaintiff would receive annual

payments in equal monthly installments for the rest of his life whether or not he chose to receive

---

[4](...continued)
> such subdivisions (c) and (d). The attorney's fees shall be
> deducted proportionately from each item of the remaining damages
> awards, including the remaining lump sum payments specified in
> such subdivisions (b), (c), and (d), and the present value of the
> remaining streams of payments specified in such subdivisions (c)
> and (d), and such fees shall be paid in a lump sum. After said
> deductions, the stream of payments specified in such subdivisions
> (c) and (d) and their present value shall be adjusted accordingly.

N.Y. C.P.L.R. § 5031(f)(3).

-30-

free medical care from the VA; thus, such an arrangement would, arguably, not achieve Defendant's goal of preventing a windfall to Plaintiff.  Furthermore, although Defendant did not explain the mechanics of how it perceives the reversionary trust would operate, presumably Defendant envisioned that Plaintiff would have to provide proof to the trustee of the reversionary trust that he had paid for medical expenses out of pocket in order to receive any money from the trust.  Section 5031 neither authorizes nor contemplates this type of payment arrangement.

After reviewing the relevant case law and the specific requirements of § 5031, the Court finds that the creation of a reversionary trust would not constitute a remedy that approximates New York's structured judgment statute.  In addition, the Court finds that creation of a reversionary trust would not be in Plaintiff's best interest.  Finally, the Court concludes, as the court did in *Andrulonis*, that, because "the FTCA contemplates a lump-sum award," this Court "lacks the power to enter judgment in this case 'in terms other than a simple award of money damages'"; and, thus, this Court cannot "mandate the purchase of an annuity or otherwise structure its award." *Andrulonis*, 724 F. Supp. at 1519 n.616 (citations and quotations omitted).  Accordingly, the Court denies Defendant's request for creation of a reversionary trust.


## IV. CONCLUSION

After reviewing the entire file in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Plaintiff's renewed request to increase his *ad damnum* clause is **DENIED**; and the Court further

**ORDERS** that Plaintiff's request to increase his award for past and future pain and suffering

is **DENIED**; and the Court further

ORDERS that Defendant's request to place Plaintiff's future economic damages award into

a reversionary trust is **DENIED**; and the Court further

ORDERS that the Clerk of the Court shall enter judgment in favor of Plaintiff in the amount

of **$5,488,680**, broken down as follows:

|  |  |
|---|---|
| (1) Past Pain and Suffering | $  500,000 |
| (2) Future Pain and Suffering | $1,500,000 |
| (3) Future Economic Damages | $3,488,680 |

**IT IS SO ORDERED.**


Dated: April 13, 2018
         Syracuse, New York


_____
Frederick J. Scullin, Jr.
Senior United States District Judge